[Civ. No. 20576. Second Dist., Div. Two. Mar. 18, 1955.]

HARRY GLASCOCK, Respondent, v. THOMAS W. SUKUMLYN, Appellant.

J. Q. Gilchrist for Appellant.

Harry A. Chamberlin for Respondent.

MOORE, P. J.—Respondent sued to enforce specific performance of an option to purchase shares in a corporation in which both parties were stockholders. From a judgment in his favor, appeal has brought the matter to this court and reversal is urged on several grounds.

Prior to June 21, 1947, respondent and others had organized Dynamic Air Engineering, Inc. On that date, respondent owned over 50 per cent of the issued stock. Appellant was owner of 111 shares. For the sum of $10, appellant on that date executed in favor of respondent an option to purchase all shares of the corporation which appellant then owned or might thereafter acquire. The pertinent terms of the option appear on the margin below.* Appellant was de-

---

*'' That in consideration of Ten Dollars ($10.00), the receipt of which is hereby acknowledged, First Party [Sukumlyn] herewith grants and gives to the Second Party [Glascock] the absolute and irrevocable right, privilege, and option at any time within a period of two (2) years from the date hereof to purchase from First Party, or in the event of the death of First Party, to purchase from his heirs, executors, or administrators, the whole number of shares of the stock of DYNAMIC AIR ENGINEERING, INC., a California corporation, which the First Party now owns or which he may hereafter acquire; and during the life of the option herewith granted, the First Party agrees that he will not directly or indirectly dispose of, hypothecate, or encumber such stock, but that he will hold the same intact to the end that the Second Party may have an opportunity during the aforesaid two (2) years of taking advantage of such option and exercising the same.

The term of this option shall be extended automatically for successive periods of two (2) years following the expiration of the initial, and each ensuing two (2) year period hereof, unless at least ninety days prior to the expiration of any such two year period the First Party shall serve upon the Second Party notice, in writing, of this intention not to extend further the period of said option.

In the event of the death of First Party, while this option agreement remains in force, then regardless of any other provisions of this agreement, or action by the parties, the term of this option shall be fixed at and it shall terminate two (2) years after the death of First Party.

The purchase price of such shares to Second Party shall be an amount equal to the cost of the said shares to the First Party. Upon the exercise of the option herewith granted the purchase price shall be payable by the execution of unsecured notes bearing four percent (4%) interest per annum and maturing two (2) years from date thereof,

sirous of acquiring additional shares from one Vernon Sharpe who owned 412 5/6 shares, but he possessed neither the means nor ability to purchase any of such shares without the effort and collaboration of respondent who declined to assist unless appellant should execute the option in his favor. The result was that as a further consideration for the execution of the option by appellant, respondent agreed with appellant to employ his best efforts to provide an opportunity for appellant to purchase some portion of the shares owned by the same Vernon Sharpe.

In reliance upon the validity of the option so granted to him, respondent expended his best effort to provide such opportunity for the purchase of the Dynamic stock by appellant, and as a result of respondent's efforts and of his placing all of his own Dynamic shares in escrow as security for the performance of a purchase agreement with Sharpe, respondent provided opportunities to, and assisted in making it possible for, appellant to purchase 268 shares subsequent to the date of the option. Such efforts by respondent in assisting appellant to purchase additional shares were made solely by reason of his reliance upon the enforcibility of his option.

Certain terms of the option must be kept in mind. (1) The initial term of the option was two years. (2) Such term was automatically *extended for successive periods* of the same duration, unless sooner terminated by notice from appellant 90 days prior to the expiration of any such period. (3) The price of the shares to respondent was to be the cost thereof. (4) The aggregate cost to respondent was to be paid by respondent's promissory note in favor of appellant, payable two years after date, bearing interest at four per cent per annum or at respondent's option, part or all cash.

After appellant had granted the option and acquired 268 additional shares, his holdings were 379 shares. The cost of the 111 shares to appellant had been $275 per share; for those he acquired after the date of the option, $121.20 per share.

or at the option of the Second Party, part or all of the payment may be made in cash. First Party states that as of the date of execution of this option agreement he is the record owner of one hundred eleven (111) shares of such stock and that the cost of those shares is Two Hundred Seventy-five Dollars ($275.00) a share.

Immediately upon the exercise of the option herewith granted all rights, privileges, and benefits pertaining to all of the such shares shall pass to and be the unimcumbered property of the Second Party.

(sic)

This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, and assigns of the parties hereto."

The court found the average cost of all 379 shares to appellant was $168.09 per share; that on the date of the option, June 21, 1947, they had a reasonable market value of no more than $100 per share, and that in March 1953 their fair market value was no more than $150 each, and have never had a greater fair market value.

On March 18, 1953, respondent delivered to appellant a notice of election to exercise his option to purchase the stock and tendered his promissory note in the sum of $63,006.60, payable two years after date with interest at 4 per cent per annum from date until paid. At the same time he demanded all the Dynamic Air Engineering stock then owned by appellant who rejected the demand and tender and refused to deliver certificates for the shares. At all subsequent times respondent stood ready, willing and able to purchase such Dynamic stock according to the terms of the option.

Respondent's amended complaint alleged the execution of the option for a consideration, the due exercise thereof, demand for compliance and tender of the promised consideration. Appellant by his answer denied (1) execution of the option, (2) adequacy of the consideration tendered, (3) the reasons for executing the option as alleged in the complaint, (4) respondent's reliance thereon, (5) prejudice to respondent if unable to obtain the shares contracted for. Also, appellant pleaded affirmatively (1) the insufficiency of the complaint, (2) fraud inducing the granting of the option, (3) inadequacy of the consideration tendered at the exercise of the option, (4) termination of the option by a "counter-offer," (5) laches in the exercise of the option. By his cross-complaint, appellant pleaded conversion of the 111 shares and alleged his ownership and right to have their possession restored to himself.

The court made findings substantially in accordance with the complaint; found neither fraud by respondent, nor lack of understanding on the part of appellant attendant upon the execution of the option, and rejected all the affirmative defenses and appellant's claim of ownership of the 111 shares.

## THE OPTION VALID

While ordinarily equity will deny specific enforcement of a contract to sell personal property, there are exceptions to the rule. The instant case reveals that the subject shares were not ordinarily obtainable; they were required by respondent for a definite purpose and a specific use; respondent

agreed to "employ his best efforts to provide an opportunity for said defendant to purchase some portion of the shares owned by said Sharpe," and he did employ his best efforts to provide appellant such opportunity and such efforts of respondent and his placing his own shares in escrow as security for the performance of a purchase agreement made with Sharpe all contributed to make it possible for appellant to purchase the 268 shares acquired by him after the date of the option.

## Option Not Unfair

■ Appellant contends that the option was unfair for the reason that he was paid only $10 therefor. His serenity is agitated because he received only $10 for the privilege of selling stock within two years with automatic extensions for successive periods of the same duration. Evidently appellant is confusing an option to buy at a .specified price within a designated time with a bilateral contract to purchase. He was not overreached and thereby induced to sell. He exercised his freeborn right to sell his stock. He consciously and knowingly agreed to sell the shares. He allowed his optionee two years to exercise the privilege and did not terminate it by use of the power he reserved. He dared not do so for the simple reason that he was using respondent to assist in acquiring the 268 shares from Mr. Sharpe. Such aid of respondent was one of the main considerations for the option.

Also, appellant argues that the optionee was not obliged by the option to do anything. That is generally true of options. They are not binding agreements to sell the subject of the option—land, mines, livestock, merchandise, corporate stock. They are offers to sell on prescribed terms and there is no contract until the offer is accepted. ■ When the latter occurs and the optionee complies with the express terms, the unilateral contract becomes bilateral. ■ Upon payment of the price named in the option within the time specified, from that moment, the optionor no longer owns an interest in the optioned property, but is owner of only the property he received as consideration. It is no hardship on a man to receive for his property the price he has demanded. If his option extends the time in which the payment may be made, he can blame no one but himself. He exercised a civil right to fix the period within which he must be paid. It would be judicial legislation to impair that right as it affects either party. A and B, two shareholders, caused their cor-

poration to issue additional shares to B who executed an option in favor of A on condition that A might purchase one half of such shares at cost within the named period. The only consideration to B was his agreement with A that B should have a controlling voice in management until otherwise agreed. B having received his price, it was held that the option for purchase of shares at cost was equitable and was enforced. (*Hirschman* v. *Casey,* 121 Neb. 471 [237 N.W. 584].) The facts there recited parallel those at bar except the latter have the further advantage in that respondent relied upon the option and his own purchase of the 111 shares at a much higher price.

This action has little concern with the option. The issue is whether the bilateral contract which came into existence with respondent's tender of the purchase price is a valid agreement. "It is not the option which it is sought to enforce, but that which, by plaintiff's acceptance of defendant's offer, has ripened into an executory contract, whereby, for an adequate consideration the one agrees to buy and the other agrees to sell. The sale of an option is an executed contract; that is to say, the lands are not sold, the contract is not executed as to them, but the option is as completely sold and transferred *in praesenti* as a piece of personal property instantly delivered on payment of the price. (*Marsh* v. *Lott,* 8 Cal.App. 384, 389 [97 P. 163].) Similar language is found in *Smith* v. *Bangham,* 156 Cal. 359 [104 P. 689, 28 L.R.A.N.S. 522]. The court there (p. 364) observed: "The plaintiff is not seeking in this action to enforce the option, but to compel compliance with the contract which resulted from his exercise of the option." (See also *W. G. Reese Co.* v. *House,* 162 Cal. 740, 744 [124 P. 442].)

Appellant argues that he was not fairly compensated because of the likely increase in value of the shares and because respondent thereafter caused all earnings of the corporation to be reinvested in its business, and that if they had been distributed among the stockholders, appellant would have received about $99,000 as dividends. Such argument is a "looking backward." In the first place, appellant never, as a director, moved for a declaration of dividends and on two occasions moved for an increase of respondent's salary. ██ But, in addition to those facts, the adequacy of consideration must be related to the date of the option; not to the date of the bilateral contract. (*Drullinger* v. *Erskine,* 71 Cal.App.2d 492, 495 [163 P.2d 48].) ██ Moreover, ap-

pellant was paid $168.09 per share, the contract price, whereas the fair market value per share at the time of the exercise of the option did not exceed $150.

But the right of respondent to specific performance arises not only out of the reasonable value tendered, but also from the fact that the shares of Dynamic Engineering had a peculiar value for respondent. They could not have been purchased readily on the open market; could be acquired from only one person; were acquired by respondent as a part of his own business program and therefore appellant's failure to deliver could not have been compensated by money judgment. (*Korabek* v. *Weaver Aircraft Corp.*, 65 Cal.App.2d 32, 39 [149 P.2d 876].)

The contention is urged that the option is too indefinite to be enforceable in that it does not appear who would be required to execute the promissory note. If A is selling one tractor to B for a promissory note of $8,000, and no other person was ever mentioned, could A reasonably expect the promissory note of anyone other than B? But when respondent herein tendered his promissory note and demanded the shares held by appellant, we find no record of an objection to respondent's note as a noncompliance with the option. But if there were any merit in such contention, it could not avail now, since the question of the identity of the author of the note to be delivered to appellant was not mentioned in the trial court.

As to the asserted uncertainty of the time of payment, the option speaks for itself. The terms and time of payment are clearly set forth.

Contention is made that the offer contained in the option was rejected; that the option was terminated by reason of a counteroffer by respondent; that a substitute offer abandons the original offer unless the optionee expressly declares that the offer in the option shall not be abandoned. But this matter was entirely disposed of by the findings that respondent did not submit to appellant a new and materially different offer for the stock, or a written counteroffer for the 379 shares; that respondent did exercise the option within a reasonable time after the expiration of the period prescribed. Such findings are final, no claim having been made that any finding is unsupported. Moreover, the arguments about the so-called counteroffer apply to offer and counteroffer in the ordinary business transactions, whereas in the case of the option from appellant to respondent, it was granted for a consideration,

was the initial step to a bona-fide contract fully executed when exercised. (See Corbin on Contracts; *First Nat. Exchange Bank* v. *Roanoke Oil Co.*, 169 Va. 99 [192 S.E. 764].)

Appellant's belated assertion that the option became an ordinary offer without consideration at the end of two years was born of an indifferent consideration of the terms of the document. The finding that there was no laches is final on this point. The option provided for automatic renewals. It is a completed transaction, irrevocable by its terms. (*Marsh* v. *Lott, supra*, 390.)

The contention that respondent's tender did not comply with the terms of the option approaches sterility. Appellant says that he tendered only $63,006.60 while it should have been $63,025; that to maintain an action in specific performance, compliance with its terms must be unequivocal and positive; that "the acceptance must in every respect correspond with the offer." (*Caldwell* v. *Dalaray Mines, Inc.*, 68 Cal.App.2d 180, 184 [156 P.2d 52].) But the finding is that the true amount required to meet the offer was the amount tendered by respondent, to wit, $63,006.60. If that was not the correct sum, it was appellant's duty to plead, in some way, at the trial that the tender was $18.50 short. No evidence is designated as proof of error by the court in its finding. In the absence of such showing, the point is deemed to have been waived. (*Tesseyman* v. *Fisher*, 113 Cal.App.2d 404 [248 P.2d 471]; *Kruckow* v. *Lesser*, 111 Cal.App.2d 198 [244 P.2d 19].)

 Appellant contends that prior to the exercise of the option, he had demanded the return of 111 shares he had delivered to respondent and that his demand had been refused; that thereby such shares were converted; that the finding there was no conversion is without evidential support. The answer to such claim is that the option provides for the holding intact of the shares during the life of the option so that the optionee might have an opportunity to acquire the stock. Also, it was agreed that upon the exercise of the option, all rights pertaining to the shares shall become the unencumbered property of respondent. The proof shows and the court found that long prior to the exercise of the option, appellant endorsed the certificate for the 111 shares and delivered them to respondent to abide the exercise of the option. How could such a transaction become an act of conversion by respondent? While the latter so held the certificate, appellant demanded it of respondent. Could the latter's refusal be construed as a conversion? It was held under a written agreement for the

happening of a certain event. Such agreement had not been terminated. Respondent's exercise of his contractual right to pay for the shares and become their owner clearly vested legal title to them in respondent. His action to enforce his right against the arbitrary conduct of appellant does not constitute conversion. The findings give respondent a clear title to the 111 shares as well as to all other Dynamic Air Engineering Inc. shares held by appellant when the option was exercised. And even if conversion of the shares had been proved, the record is destitute of proof of damage. The court found the value of the shares to have been $150 each at the time the option was exercised, whereas respondent paid appellant $168.09 per share.

Judgment affirmed.

McComb, J., and Fox, J., concurred.