[No. B082481. Second Dist., Div. Two. Aug. 25, 1995.]

PHILIP STANCHFIELD, Plaintiff and Appellant, v.
HAMER TOYOTA, INC., Defendant and Respondent.

## COUNSEL

Meisenheimer & Herron, Matthew V. Herron and Robert M. Steele for Plaintiff and Appellant.

Lowthorp, Richards, McMillan, Miller, Conway & Templeman, Alan R. Templeman and John Q. Masteller for Defendant and Respondent.

## Opinion

**BRANDLIN, J.\***—On August 5, 1991, plaintiff Philip Stanchfield filed suit against Hamer Toyota, Inc., and other defendants (referred to collectively as Hamer Toyota) seeking damages for breach of an employment agreement and specific performance of a stock purchase agreement. His complaint also included other causes of action which are not pertinent here.

The matter proceeded to trial on September 15, 1993. At the conclusion of the evidence, appellant moved for a directed verdict on his breach of contract cause of action, urging he had been summarily discharged on August 9, 1990, without the written notice required by the employment agreement.[1] The trial court granted the motion and submitted the issue of damages to the jury. It returned a special verdict awarding appellant $130,000 as a result of Hamer Toyota's breach. Immediately thereafter, the trial court was asked to order Hamer Toyota to specifically perform on the stock purchase agreement. It declined to do so. Appellant has appealed from the judgment entered after trial.

### Facts

In 1987, appellant became the general manager of Hamer Toyota, where he had previously worked as a salesman and a finance manager. The following year, appellant and Lee Hamer, the president of Hamer Toyota, entered into discussions about the possibility of appellant purchasing the stock of the dealership. Their dialogue culminated in appellant's execution of employment and stock purchase agreements on February 3, 1989. The employment agreement provided appellant would receive a monthly salary of $10,000, an automobile, health insurance and a bonus of 20 percent of the annual net operating profit of the dealership. The stock purchase agreement called for Hamer Motors, Inc., the principal shareholder of Hamer Toyota, to sell appellant 92 percent of its stock for $5,979,991. It was anticipated appellant would procure 49 percent of the stock with the bonuses he accrued under the employment agreement and an escrow was set up to facilitate that aspect of the parties' agreement. The remaining 51 percent of the stock was to be purchased with additional funds raised by appellant.

---

\*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.

[1]The agreement's notice provision reads: ". . . In the event that Employer shall terminate Employee's services under the provisions of this Agreement, Employer shall give at least two weeks written notice to Employee of its intent to terminate the Employee's employment under the terms of this Agreement, said notice specifying the reason for termination, and at the expiration [*sic*] of said two week period, if Employee has not agreed in writing with Employer to cure the reasons for termination, Employee's employment shall terminate and Employee shall not be entitled to any compensation under the terms of this Agreement, or otherwise, after the effective date of termination."

During appellant's tenure as general manager of Hamer Toyota, he was frequently absent from the dealership. When he was present, he repeatedly engaged in conduct which fostered an unbusinesslike atmosphere in the office. In 1989 and 1990, the dealership suffered substantial losses due to false reporting of sales during incentive periods, improper documentation of fleet sales, and the failure to demand cashier's checks or cash from auto brokers. By early 1990, the relationship between appellant and Hamer had become strained. On July 9, 1990, Hamer wrote a performance review memorandum to the Hamer Toyota board of directors detailing his complaints about appellant's lack of effective leadership and planning. The memo called upon appellant to correct the problems within 30 days and instructed him to undertake certain specified actions. The board of directors apparently adopted a resolution incorporating those directives at its meeting of July 9, 1990. A month later, the board summarily discharged appellant.

A few days after his termination, appellant was hired as general manager of Mike Miller Toyota, where he commenced work on August 15, 1990. His compensation included an initial base salary of $10,000 per month, a vehicle, medical benefits and 10 percent of the dealership profits. He worked at Mike Miller Toyota for just two months before being fired on October 16, 1990. According to Mike Miller, the president of Mike Miller Toyota, appellant had overstated sales and incentives during the time he served as general manager and the dealership lost employees and sales. The day before appellant was discharged, he was out of the office playing golf at a particularly critical time. After his departure as general manager of Mike Miller Toyota, appellant obtained employment in other capacities at several dealerships for periods ranging from one month to eight months.

## CONTENTIONS

Appellant contends: "[I.] The trial court's modification of BAJI 10.16 misdirected the jury resulting in a miscarriage of justice. . . . [II.] Admission of Art Miller's testimony was an abuse of discretion. . . . [III.] The trial court erroneously denied appellant specific performance as to the stock purchase agreement. . . . [IV.] The trial court's exclusion of the testimony of Lee Hamer was an abuse of discretion."

## DISCUSSION

### I.  *BAJI No. 10.16*

The jury was given, over appellant's objection, a modified version of BAJI No. 10.16, which read: "An employee who was damaged as a result

of a breach of an employment contract by the employer, has a duty to take steps to minimize the loss by making a reasonable effort to find *and retain* comparable employment. [¶] If the employee through reasonable efforts could have found *and retained* comparable employment, any amount that the employee could reasonably have earned by obtaining *and retaining* comparable employment through reasonable efforts shall be deducted from the amount of damages awarded to employee." (Italics designate modifications to the standard BAJI instruction.)

BAJI No. 10.16, as drafted by the Committee on Standard Jury Instructions, Civil, of the Superior Court of Los Angeles County (BAJI Committee), does not contemplate a setting in which the wrongfully terminated employee actually secures a substantially similar job. It offers a method of calculating damages based upon what an employee *could* have earned *if* the employee *could* have found comparable work. This is not surprising since the typical inquiry where an employer asserts a former employee did not mitigate damages is whether the employee unreasonably rejected or failed to find comparable employment. Thus, in *Parker* v. *Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176 [89 Cal.Rptr. 737, 474 P.2d 689, 44 A.L.R.3d 615], which is referred to in the comment to BAJI No. 10.16, the court was faced with an employee's failure to accept her employer's tendered substitute employment. The sole question in the case was whether the employer's alternate employment offer was comparable or substantially similar to that of which the employee had been deprived, so that the employee's refusal to accept it could be used to mitigate the employer's damages. ▮ In resolving this point adversely to the employer, the court elucidated the standard applicable in such instances: "The general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment. [Citations.] However, before projected earnings from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived; the employee's rejection of or failure to seek other available employment of a different or inferior kind may not be resorted to in order to mitigate damages. [Citations.]" (*Parker* v. *Twentieth Century-Fox Film Corp.*, *supra*, 3 Cal.3d at pp. 181-182.)

The court in *California School Employees Assn.* v. *Personnel Commission* (1973) 30 Cal.App.3d 241 [106 Cal.Rptr. 283] addressed the underlying rationale for the mitigation rule, quoting from earlier cases which had

commented on the subject. " 'The familiar rule requiring a plaintiff in a tort or contract action to mitigate damages embodies notions of fairness and socially responsible behavior which are fundamental to our jurisprudence. Most broadly stated, it precludes the recovery of damages which, through the exercise of due diligence, could have been avoided. Thus, in essence, it is a rule requiring reasonable conduct in commercial affairs. This general principle governs the obligations of an employee after his employer has wrongfully repudiated or terminated the employment contract. Rather than permitting the employee simply to remain idle during the balance of the contract period, the law requires him to make a reasonable effort to secure other employment.'

"The issue has also been discussed in terms of [an employee's] duty . . . to minimize his loss. Thus Judge Cardozo stated: ' "The servant is free to accept employment or reject it according to his uncensored pleasure. What is meant by the supposed duty is merely this: That if he unreasonably reject, he will not be heard to say that the loss of wages from then on shall be deemed the jural consequence of the earlier discharge. He has broken the chain of causation, and loss resulting to him thereafter is suffered through his own act." [Citation.]' [Citation.]" (*California School Employees Assn.* v. *Personnel Commission, supra,* 30 Cal.App.3d at p. 249.)

 The parties have not cited nor has our independent research revealed any cases analyzing what is meant by the duty to mitigate in the context of a discharged employee who, after finding and accepting comparable employment, loses the position because of his or her own conduct. Nor, as we have previously indicated, is this factual scenario covered by the standard BAJI No. 10.16 instruction.[2] However, when one considers the basic principles underlying the mitigation rule, it is manifest that a jury, in deciding the reasonableness of a wrongfully discharged employee's efforts to mitigate damages, may properly take into account that employee's failure to retain comparable employment once it has been secured. The crux of the mitigation rule is that while the compensation to which the employee would have been entitled for the unexpired period of the contract affords a prima facie measure of damages, the employee's "actual damage is the amount of money he [or she] was out of pocket *by reason of the wrongful discharge.*" (*Erler* v. *Five Points Motors, Inc.* (1967) 249 Cal.App.2d 560, 567-568 [57 Cal.Rptr. 516], italics added.) Therefore, in those instances where the jury determines the employee was fired from a substantially similar position for cause, any amount the employee with reasonable effort could have earned by retaining that employment should be deducted from the amount of damages

[2]We urge the BAJI Committee to consider modifying BAJI No. 10.16 to describe the nature of an employee's duty to mitigate damages under such circumstances.

which otherwise would have been awarded to the employee under the terms of the original employment agreement.

In our present case, the record contains ample evidence to sustain findings that appellant obtained comparable employment within days after being wrongfully terminated by Hamer Toyota and that despite the fact his new position was of the "at will" variety, he was fired for good cause. That being so, there is no basis for concluding he was prejudiced by the trial court's decision to modify BAJI No. 10.16

II. *Admission of Art Miller's Testimony*

On March 29, 1993, Hamer Toyota designated Art Miller as its damages expert and, in a declaration executed on that date, its counsel averred Miller would "be sufficiently familiar with the pending action to submit to a meaningful oral deposition pertaining to his specific testimony including his opinions and its basis [*sic*] that he is expected to give at trial *upon his review of the conclusions and opinions reached by plaintiff's expert witness, Arthur Brodshatzer. . . .*" (Italics added.)

Pursuant to a stipulation of the parties, the discovery referee ordered appellant and Hamer Toyota to produce their respective damages experts for deposition on a mutually agreeable date. Appellant's expert was to be deposed first. The depositions were ultimately set for July 6, 1993. Hamer Toyota deposed appellant's expert that morning and Miller appeared for his deposition that afternoon. He testified he had not completely developed his opinions concerning appellant's damages and needed approximately 16 hours to complete his work.

Despite appellant's inability to complete Miller's deposition to his satisfaction on July 6, 1993, he neither informally requested that Hamer Toyota produce Miller for a follow-up deposition, nor sought relief from the discovery referee for Miller's failure to comply with the referee's order, nor made an *in limine* motion to exclude Miller's testimony at trial. Rather, he waited until Miller was scheduled to take the stand on October 4, 1993, to voice his first objection. Following a full discussion of the matter, the trial court denied appellant's oral motion to exclude Miller's testimony, citing appellant's failure to make reasonable arrangements to continue the deposition or seek appropriate relief before trial.

Code of Civil Procedure section 2034, subdivision (j)(4) requires the trial court, "on objection of any party who has made a complete and timely compliance with [the section's exchange requirements]," to "exclude from

evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to . . . [¶] [m]ake that expert available for a deposition . . . ."

While there is no express requirement that the objection be raised before trial, the exclusion sanction applies only if noncompliance with the statute was "unreasonable." This limitation "may prevent parties from waiting until trial to raise objections that could have been raised beforehand. I.e., without notice and opportunity to correct deficiencies before trial, a court may find the failure to comply was not 'unreasonable' . . . ." (2 Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1994) ¶ 8:1719.2, p. 8J-28, rev. #1, 1994.)

In the instant case, it seems clear Miller's lack of readiness at the appointed hour was attributable not to gamesmanship, but to the brief time span between Brodshatzer's deposition and his. Miller surmised he could be ready "to render the opinions [he] intend[ed] to give at trial" in approximately 16 hours. Appellant made no showing that he would have been irreparably harmed by waiting a day or two to complete Miller's deposition, nor can we imagine that would have happened. Nonetheless, for whatever reason, he elected not to pursue the matter further until more than two weeks into the trial. Under the circumstances, the trial court was persuaded it was appellant who had acted unreasonably.

We perceive no abuse of discretion in this ruling. The slight delay which would have been incurred had appellant responded promptly to the situation on July 6, 1993, would in no way have compromised the purposes of the discovery statutes. ■ "They are intended, among other things, to assist the parties and the trier of fact in ascertaining the truth; to encourage settlement by educating the parties as to the strengths of their claims and defenses; to expedite and facilitate preparation and trial; to prevent delay; and to safeguard against surprise. [Citation.]" (*Beverly Hospital* v. *Superior Court* (1993) 19 Cal.App.4th 1289, 1294 [24 Cal.Rptr.2d 238].) ■ In this respect, the facts of our case differ from those in *City of Fresno* v. *Harrison* (1984) 154 Cal.App.3d 296 [201 Cal.Rptr. 219], cited by appellant. There the objecting party's first opportunity to depose the expert occurred less than two weeks before trial, rendering "the exercise . . . futile in light of the fact that the expert had neither reviewed the data, settled upon a method, nor reached an opinion." (*Id.* at p. 301.) Equally distinguishable are two additional cases relied upon by appellant, *Zellerino* v. *Brown* (1991) 235 Cal.App.3d 1097 [1 Cal.Rptr.2d 222] and *Waicis* v. *Superior Court* (1990) 226 Cal.App.3d 283 [276 Cal.Rptr. 45]. As the court in *Zellerino* observed, the plaintiff's actions in failing to comply with section 2034's disclosure

requirements "were not mere infractions"; she engaged in "a comprehensive attempt to thwart the opposition from legitimate and necessary discovery." (235 Cal.App.3d at p. 1117.) In *Waicis,* the trial court disqualified the plaintiff's expert after finding he had "repeatedly been uncooperative in allowing his deposition to be taken . . . ." (226 Cal.App.3d at p. 284.)

After appellant failed in his attempt to prevent Miller from taking the stand, he unsuccessfully sought to have Miller's testimony stricken. He now argues that the trial court abused its discretion by refusing to strike Miller's testimony. We disagree. Appellant's suggestion that a follow-up deposition would have been meaningless because Miller had not completed his work until after the trial started is not borne out by the record. Miller merely testified that a few days before taking the stand, he had revised some "work that [he] had already done . . . ." There was no reason to believe based upon that comment that Miller would not have been ready to continue his deposition within 16 hours as originally estimated, if appellant had endeavored to arrange a follow-up session.

III.  *Specific Performance*

■  Hamer Toyota offered uncontroverted expert testimony to establish appellant was unable to perform under the stock purchase agreement either at the time of trial or one year from that date. Appellant contends such evidence was irrelevant and contrary to the terms of the agreement, which gave him one year after he had acquired 49 percent of the Hamer Toyota stock, or Hamer had become permanently disabled or died, to complete the purchase. Appellant's expert testified that "2001 represents the estimate of Mr. Hamer's life expectancy plus one year" and 2006 the year in which it could be expected that appellant would have accumulated the amount of money needed to buy 49 percent of the stock.

Appellant's analysis, even if correct, does not establish the trial court erred in refusing to grant specific performance. Though there is authority for the notion that specific performance is appropriate in cases involving closely held stock (see, e.g., *Gilfallan* v. *Gilfallan* (1914) 168 Cal. 23, 26 [141 P. 623]; *Steinmeyer* v. *Warner Cons. Corp.* (1974) 42 Cal.App.3d 515, 519 [116 Cal.Rptr. 57]; *Kaneko* v. *Okuda* (1961) 195 Cal.App.2d 217, 234 [15 Cal.Rptr. 792]; *Glascock* v. *Sukumlyn* (1955) 131 Cal.App.2d 587, 593 [281 P.2d 90]; *Korabek* v. *Weaver Aircraft Corp.* (1944) 65 Cal.App.2d 32, 39 [149 P.2d 876]), "an essential basis for the equitable remedy must be a showing by the plaintiff of performance, or tender of performance, or ability and willingness to perform. [Citations.]" (*Cockrill* v. *Boas* (1931) 213 Cal. 490, 492 [2 P.2d 774].) Here, appellant failed to demonstrate he could have

performed his obligations under the agreement within the time frame identified by his own expert. In fact, what evidence was produced on the subject suggested he had neither the personal assets nor the ability to obtain the commercial financing necessary to conclude the stock transaction. Having failed to meet his burden of proof below, he is precluded from successfully challenging the trial court's determination on appeal.[3]

### IV. *Exclusion of Lee Hamer's Testimony*

■ When appellant gave notice that he intended to depose Lee Hamer on April 26, 1993, Hamer Toyota asked him to withdraw it, citing Hamer's medical condition. Appellant failed to do so and Hamer Toyota sought a protective order. On May 11, 1993, the date the issue was set for hearing before the discovery referee, the parties conditionally stipulated Hamer Toyota would withdraw its motion for a protective order and produce Hamer for a deposition on or before August 2, 1993. If Hamer's medical condition had not improved by that time, Hamer Toyota would be obliged to move again for a protective order.

Appellant noticed Hamer's deposition for August 2, 1993, and Hamer Toyota moved for a protective order, supporting its motion with the declaration of Hamer's primary treating physician, Doctor Keith Richman. Richman averred that Hamer suffered from organic brain syndrome, or senility, that the stresses of a deposition would exacerbate his condition "and render him confused to such an extent that any deposition testimony would be incompetent," and that it was "extremely unlikely" Hamer's situation would improve in the future. The discovery referee granted Hamer Toyota's motion on August 12, 1993, without prejudice to appellant's ability to raise the matter in the trial court.

As expected, a subsequent hearing was held to determine Hamer's competency to testify at trial. Richman, Hamer Toyota's sole witness, testified the 82-year-old Hamer suffers from chronic organic brain syndrome and dementia. As a result, Hamer has difficulty with immediate recall and short-term memory, hallucinates, experiences confusion and "confabulates." The doctor explained, "a confabulation is where a patient would make up a story when their memory loses them." Richman indicated Hamer's condition is progressively worsening and opined that placing him in an unfamiliar setting, such as a courtroom, would exacerbate his problems.

Appellant attempted to rebut Hamer Toyota's evidence through the testimony of a psychiatrist, Robert Rubin. Rubin's opinions were largely limited

---

[3]Given our resolution of this contention, we need not consider whether the trial court's ruling is also sustainable on the ground that granting specific performance would require such protracted judicial oversight as to render that remedy unduly burdensome.

to general observations about organic brain syndrome and dementia, since he had never examined Hamer and had reviewed only a portion of Hamer's medical records after listening to Richman testify.[4] Appellant also called as witnesses two individuals who worked at Hamer Toyota and served on its board of directors. They established that Hamer continued to go to the dealership on a part-time basis and to attend board meetings. However, their testimony also revealed that Hamer had serious memory problems and was not really capable of participating in the business in a meaningful way.

In light of the uncontroverted medical evidence concerning the nature of Hamer's mental difficulties, the trial court found he was incapable of understanding the duty of a witness to tell the truth and was thus disqualified under Evidence Code section 701. It further expressed the view that having Hamer, who had been placed on call by Hamer Toyota, testify would be of no benefit given the manner in which his condition manifested itself. We cannot say this constituted an abuse of discretion and the trial court's decision must therefore be upheld on appeal. (*People* v. *McCaughan* (1957) 49 Cal.2d 409, 421 [317 P.2d 974]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 166 [5 Cal.Rptr.2d 450]; *People* v. *Farley* (1979) 90 Cal.App.3d 851, 869 [153 Cal.Rptr. 695, 12 A.L.R.4th 301].)

### DISPOSITION

The judgment is affirmed.

Fukuto, Acting P. J., and Nott, J., concurred.

A petition for a rehearing was denied September 15, 1995, and appellant's petition for review by the Supreme court was denied November 16, 1995.

---

[4]Although appellant asked that his expert be permitted to examine Hamer, his request was made after the competency hearing was underway. The trial court denied this request as having been belatedly made.