Filed 4/11/13  Milner v. Regents of U.C. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| LARRY D. MILNER, SR.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Respondent. | D060037<br><br><br>(Super. Ct. No. 37-2008-00078431-CU-PO-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Luis R. Vargas, Judge.  Reversed.


Plaintiff and appellant, Larry D. Milner, Sr. (Plaintiff) sued defendant and respondent, The Regents of the University of California (the Regents) on medical malpractice theories arising out of the death of his 29-year-old son, Larry Milner, Jr. ("Larry Jr."), who was hospitalized at the Regents' University of California San Diego Medical Center and being treated for a variety of medical problems.  Since Plaintiff was

representing himself in the trial court and was out of the country on military deployment after he filed his complaint, the court granted several continuances of the trial date. The month before trial, the court denied a summary judgment motion by the Regents, after Plaintiff supplied a declaration about causation of harm from a retained expert medical witness.

At trial call, the Regents obtained judgment on their motion for nonsuit, following the trial court's granting of their motion in limine that disallowed any late designation of Plaintiff's expert medical witness. (Code Civ. Proc., § 2034.720; all further statutory references are to the Code of Civil Procedure unless otherwise specified.) Without that expert being designated, Plaintiff could not address at trial the element of causation of injury from the alleged medical negligence. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118 (*Jennings*).)

Plaintiff challenges the resulting judgment, contending it was an abuse of discretion for the trial court to exclude his expert from testifying. He argues that his "delay in designating that expert was, at most, an honest mistake and was not unreasonable under controlling law," specifically, section 2034.720. Plaintiff relies on that section to argue that "other, more appropriate alternatives existed to address the Regents' objection to Dr. [Stephen L.] Fischer's testimony at trial," such as imposition of terms and conditions for permitting the late designation (§ 2034.720, subd. (d)), since the Regents had become aware of the content of Dr. Fischer's proposed testimony at trial, through the summary judgment proceedings.

2

Plaintiff consequently argues the trial court erred in granting the Regents' nonsuit motion, since Plaintiff could presumably have presented sufficient expert opinion and nonexpert evidence from which a trier of fact could have found causation of the harm from the actions or inactions of the Regents.

We agree with Plaintiff that given the Regents' advance knowledge of the identity of Plaintiff's expert witness and his views, and in light of the difficulty evidenced in the record about Plaintiff's problems in navigating trial procedure, the trial court abused its discretion in excluding the expert testimony, since there was no showing of undue prejudice to the Regents in allowing a late designation conditioned on a reasonable process for deposition. On this record, it was inconsistent for the trial court to end the case in this manner when it had previously exercised its discretion to allow continuances, to attempt to settle the case, and otherwise to accommodate the needs of Plaintiff in representing himself. The trial court did not adequately apply the statutory criteria in section 2034.720, the nonsuit was unwarranted, and we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. Larry Jr.'s Illness and Medical Care

Larry Jr. suffered from numerous ailments, including lupus, anemia, and congestive heart failure. In August 2006, he had received a kidney transplant and was required to take immunosuppressive medications to prevent rejection of the organ. This type of medication is known by physicians to make a patient more susceptible to opportunistic infections.

3

In January 2007, Larry Jr. was being treated for such an infection by the Regents' staff, and he was admitted to the hospital and given broad spectrum antibiotics. After a period of time, he was discharged to a skilled nursing facility for continued antibiotic treatment. During treatment, he was given a chest x-ray that revealed a 4.l cm. mass in his lung, suggesting there was a growth or neoplasm there.

During February 2007, Larry Jr. was receiving antibiotics and being monitored by Regents' physicians. He went to the infectious disease clinic on February 20, 2007 for further tests and evaluation and the doctors diagnosed anemia-related side effects from the powerful antibiotics he had received. The next day, after he was readmitted to the hospital, another chest x-ray showed there was a 10 cm. lung mass, where the smaller one had been. A radiology report comparing the two x-rays indicated that the size of that mass was "unchanged."

Larry Jr. soon became sicker and was moved to the hospital's critical care unit (CCU). He was suffering from compromised breathing and limited heart function. He had a heart attack and was later pronounced dead.

At autopsy, the pathologist determined the cause of death to be septic shock, secondary to a "disseminated zygomycosis infection" (a large fungal infection) in the lung and heart tissues, and a background bacterial infection. This type of large fungal infection will normally be fatal unless aggressive treatment is quickly initiated through the introduction of anti-fungal medications. Immunocompromised patients whose immune systems have been further depressed through recent antibiotic use are particularly vulnerable to such infections.

4

B.  Litigation and Trial Continuances; Regents' Expert Designation

Acting in propria persona, Plaintiff filed his medical malpractice complaint against the Regents in February 2008.  In April 2009, he obtained counsel, who filed a first amended complaint (FAC) alleging wrongful death, in that Larry Jr. suffered from a deadly fungal lung infection, which was not properly diagnosed, monitored, or treated by his health care providers.  Plaintiff alleged that the knowledge gained by the Regents' staff members about this patient's medical history, including the compromised nature of his immune system, imposed upon them a heightened obligation to timely diagnose and actively treat the presence of a rapidly growing fungal infection in his lung.  The Regents filed an answer and discovery began.  At a hearing on March 23, 2010, the court set a trial date of September 24, 2010, along with other calendar dates.  The expert witness exchanges were scheduled for July 16 and July 30, 2010.

During much of the litigation, Plaintiff was employed as an active duty naval officer and was deployed in the South Pacific.  Plaintiff had difficulty retaining counsel to pursue the case in his absence, which he blamed upon the complexity of the case and the financial limitations on recovery posed by medical malpractice regulations.  In April 2010, the Regents filed a summary judgment motion and obtained a hearing date.  The Regents complied with the original expert designation date, and identified their expert as Dr. Gonzalo R. Ballon-Landa, who is an internist with a subspecialty in infectious disease, who has been in private practice as an infectious disease consultant since 1983.

At hearings in June and September 2010, Plaintiff's counsel sought to withdraw and the court told Plaintiff he needed to retain a new attorney by the end of October 2010.

5

Plaintiff got new military orders and returned to California by October 1, 2010. The trial date was continued from October 15, 2010 to January 21, 2011. Plaintiff could not find new counsel and continued to represent himself. At a continuance request filed November 29, 2010, Plaintiff represented that he had found a medical expert, Dr. Fischer from Louisiana, to prepare a declaration in opposition to the summary judgment motion.

Under those circumstances, the court granted Plaintiff's request for another continuance of the trial date, from January 2011 to April 2011. The parties agreed to continue the hearing date for the summary judgment motion to March 11, within 30 days before trial. The December 1, 2010 minute order granted Plaintiff's ex parte request to continue "all dates," moving the summary judgment from December 2010 to March 11, 2011, and continuing trial until April 15, 2011. The record is unclear about whether the expert exchange dates, originally set for July 16 and 30, 2010 (for a Sept. 2010 trial) were also continued, as the minute order does not say.

C. Summary Judgment Motion; Continuance; Plaintiff's Expert Designation

In support of the Regents' summary judgment motion, they argued that any alleged negligence on the part of their health care providers did not cause the death of Larry Jr. Their expert, Dr. Ballon-Landa, provided a declaration stating he had reviewed five volumes of patient records dating back to 2001, and was qualified to render an opinion on causation issues. He summarized the treatment that Larry Jr. received from January 13, 2007 until his death, and gave his opinion that Larry Jr.'s pre-existing medical conditions were a significant factor in the development of the deadly fungal infection, as well as his inability to fight it. This kind of infection has an extremely high mortality rate, and 50 to

6

85 percent of all patients who have compromised immune systems will die from it, regardless of the treatment provided. The doctor thus stated that to a reasonable degree of medical probability, no matter when treatment would have been initiated upon diagnosis, and no matter what treatment could have been rendered, Larry Jr. would have died from the infection. The doctor believed that an earlier transfer to the CCU would not have altered the course of the infection nor prevented the death. He thus gave his opinion that the moment Larry Jr. became infected with this fungus, he was "destined to die" from it, and nothing that the Regents providers did or failed to do caused his death, nor did anything they did contribute to his death.

Plaintiff did not file opposition to the motion until February 2011. He claimed medical negligence had caused Larry Jr.'s death, based on a declaration from Dr. Fischer, a licensed Louisiana physician trained in preventive medicine and public health. Dr. Fischer stated that based on his review of the medical records, and the defense doctor's declaration, his opinion was that the Regents' medical staff had failed to timely and properly investigate, work-up, evaluate, and treat Larry Jr.'s lung infection. According to Dr. Fischer, the first chest x-ray disclosing there was a lung lesion should have been followed up with anti-fungal medication, and if this had been done, the Regents' doctors could have prolonged Larry Jr.'s life. He therefore opined that the Regents had breached the standard of care in their failure to properly diagnose and timely treat that condition, and therefore, that failure caused his death.

The Regents filed reply papers, including written objections to the declarations by Dr. Fischer and by Plaintiff. They challenged the foundation for the opinions given by

7

Dr. Fischer and stated they were only conclusory and speculative opinions. (*Jennings, supra*, 114 Cal.App.4th 1108, 1117.)

On March 11, 2011, the trial court heard argument and denied summary judgment, on the basis that triable issues of fact had been raised regarding causation of injury, and whether Larry Jr. possibly could have lived longer if his lung mass had been worked up and if he had been more closely followed as an inpatient and outpatient. However, the court frankly told Plaintiff that the threshold for denying the motion was pretty low, and the court did not intend to communicate a "wholehearted endorsement" of the quality of Dr. Fischer's expert opinion.

On March 15, 2011, after the denial of summary judgment, Plaintiff prepared a formal designation of Dr. Fischer as his expert witness pursuant to section 2034.210, but did not serve it until March 30, 2011. Plaintiff offered to promptly make Dr. Fischer available for deposition by the Regents.

Plaintiff and counsel for the Regents collaborated to prepare a joint trial readiness conference report (TRC), that was dated March 24, 2011. It lists Dr. Fischer as a "witness" for Plaintiff. The joint report does not contain any objection by the Regents to the timeliness of Plaintiff's recent expert witness disclosure, or explain how they were prejudiced by that disclosure. Instead, the copies in this record are not conformed and not signed, and state as a matter of form that to the best of the parties' knowledge, all deadlines set by the court for exchange of experts had been met and discovery was complete.

8

D. Expert Evidence and Nonsuit Rulings

Plaintiff obtained counsel to assist him in settlement efforts, and on April 19, 2011, the trial court conducted a settlement conference, but it was unsuccessful. Trial began April 26, 2011. At the outset of trial, the Regents moved to exclude expert testimony from Plaintiff, for lack of a timely designation. They argued that Plaintiff had been required to disclose Dr. Fischer by July 30, 2010, to counter-designate the Regents' expert declaration (made pursuant to the original trial date set in this matter). Thus, Plaintiff's designation on March 15, 2011, even in light of the continuances granted by the trial court, was tardy on its face.

In response, Plaintiff argued his failure to previously designate Dr. Fischer was due to "mistake, inadvertence . . . or excusable neglect." (§ 2034.720, subd. (c)(1).) He reiterated he had been deployed overseas with the Navy in the summer of 2010, was still searching for new counsel at that time, and believed that the designation date had been continued by the trial court along with all other relevant calendar events, and that he had been misled by defense counsel in some way. He returned to San Diego in late September 2010. He claimed he had not received the Regents' original designation from July 2010, although he later saw a proof of service for it.

Plaintiff thus argued it was excusable that he did not formally designate Dr. Fischer as his medical expert earlier. He also claimed he had brought an ex parte motion for relief from late designation, but since the parties were pursuing a court-ordered settlement conference in April of 2011, he took the motion off calendar. He said he was willing to make Dr. Fischer available for deposition immediately.

9

At argument, the court candidly told Plaintiff that the summary judgment declaration Plaintiff had offered was not as "robust" as it could have been, but summary judgment principles had required a more cautious ruling. After emphasizing that a jury panel was waiting, and the court had made numerous efforts to be fair to Plaintiff, and there had been no trickery by counsel for the Regents, the court granted the Regents' motion to exclude Plaintiff's expert. The court then discussed with counsel for the Regents what the next step should be, suggesting a nonsuit, due to the evident difficulties with proving the causation element of Plaintiff's professional negligence claim, without any expert evidence. Next, the Regents' counsel brought an impromptu nonsuit motion. In response, Plaintiff's offer of proof was Dr. Fischer's declaration, from his summary judgment opposition.

In granting the nonsuit motion, the trial court essentially ruled Plaintiff had no case and had failed to present any acceptable excuse for delay. Judgment in the Regents' favor was entered and this appeal followed.

DISCUSSION

I

*INTRODUCTION AND STANDARD OF REVIEW*

The vehicle for Plaintiff's request for relief from his late expert designation was the opposition he filed to the Regents' motion in limine for exclusion of his expert testimony. Plaintiff argued he could show the kind of "mistake, inadvertence, surprise, or excusable neglect" that is designated as potentially worthy of relief in section 2034.720,

10

subdivision (c)(1). On appeal, he contends the trial court abused its discretion by granting the Regents' motion to exclude his expert evidence. (§ 2034.720.)

In the subsequent nonsuit ruling, the trial court determined as a matter of law that the evidence relied on by Plaintiff (Dr. Fischer's declaration) would be insufficient to permit the jury to find in his favor. That declaration was produced in February 2011 for the hard fought summary judgment proceedings heard in March 2011. The court denied the summary judgment motion, determining that Dr. Fischer's declaration raised at least some triable issues about causation of injury.

Because of the nature of these inextricably interrelated issues about the exclusion of expert testimony and the granting of a nonsuit, our review is conducted by determining if the proposed expert testimony could have provided legally sufficient support for a finding in favor of the plaintiff on the issue of causation. (*Jennings, supra*, 114 Cal.App.4th 1108, 1119, fn. 9.) The trial court's ruling on a motion to exclude an expert's opinion is reviewed for an abuse of discretion. (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950 (*Boston*).) Such an exercise of "discretion is always delimited by the statutes governing the particular issue," here, the terms of section 2034.720. (See *Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1107 (*Zellerino*).)

To decide whether a nonsuit is justified, " 'the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff ['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in

11

plaintiff['s] favor." ' [Citation.] A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' [Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291.) "The plaintiff must be given an opportunity to present all the facts he expects to prove before a nonsuit is proper." (*Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 273.)

We next examine Plaintiff's claim that the statute, properly applied, would have allowed him a reasonable opportunity to cure the defective designation he made, even under any appropriately imposed terms or conditions. (§ 2034.720, subd. (d).) We are mindful that when Plaintiff was acting as a litigant in propria persona, he was "entitled to the same, but no greater, rights than represented litigants and [was] presumed to know the [procedural and court] rules." (*Wantuch v. Davis* (1995) 32 Cal.App.4th 786, 795.) We are also mindful that the trial court repeatedly acknowledged and accommodated some of Plaintiff's unavoidable logistical difficulties, up to a point, and we review the current rulings in the factual and legal context of the entire set of proceedings. (§ 906 [appellate court may address intermediate orders affecting the judgment on appeal].)

II

*EXPERT DESIGNATION RULES*

A. Statutory Scheme

Section 2034.300 provides in relevant part: "[O]n *objection of any party* who has made a complete and timely compliance with Section 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has *unreasonably* failed to do any of the following: (a) List that witness as an expert

12

under Section 2034.260." (Italics added.) The Regents raised objections to the late designation, but the record is susceptible to different conclusions about the timeliness of those objections, and whether the trial court properly applied the criteria of section 2034.720 in determining that Plaintiff's failure to list the expert at an earlier date was unreasonable.

"The legal principles that govern the subject of discretionary action vary greatly with context." (See *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1298.) According to its title, section 2034.720 defines the scope of judicial authority to grant leave for tardy filing of expert witness information and to require the satisfaction of certain conditions. Section 2034.720 codifies the factors on which discretion shall be exercised, and the trial court is required to evaluate an application for relief for whether the statutory criteria have been met.

"Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion. [Citation.] If the trial court is mistaken about the scope of its discretion, the mistaken position may be 'reasonable,' i.e., one as to which reasonable judges could differ. [Citation.] But if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law." (*City of Sacramento v. Drew, supra*, 207 Cal.App.3d 1287, 1297-1298.)

Under section 2034.720, subdivisions (a) through (c), the court must use its discretion in evaluating the relevant criteria, which include any reliance by the objecting party on the lack of any expert designation; the existence of any prejudice to the objecting party in attempting to proceed on the merits; and the degree of diligence

13

exhibited by the tardy party, and whether genuine mistake, inadvertence, surprise, or excusable neglect existed for the tardy party, as well as any remedial action. Under section 2034.720, subdivision (d), the court may impose conditions on relief, such as making the expert available immediately for a deposition, "and on any other terms as may be just . . . ."

### B. Noncompliance with Expert Designation Rules

Examples of when a trial court, under section 2034.720, has found a failure to comply with expert designation rules to be "unreasonable," include a party's conduct that gives the appearance of gamesmanship, such as undue rigidity in responding to expert scheduling issues. (*Stanchfield v. Hamer Toyota, Inc.* (1995) 37 Cal.App.4th 1495, 1504 (*Stanchfield*).) When an expert was not fully prepared at deposition, but the party offering the expert said he would be made available in a day or two, it was deemed unreasonable for the opposing party to say nothing, but then to move, during trial, to exclude the expert. (*Ibid.*) The operative inquiry is whether the conduct being evaluated will compromise these evident purposes of the discovery statutes: "to assist the parties and the trier of fact in ascertaining the truth; to encourage settlement by educating the parties as to the strengths of their claims and defenses; to expedite and facilitate preparation and trial; to prevent delay; and to safeguard against surprise." (*Boston, supra,* 170 Cal.App.4th 936, 950.)

In *Zellerino,* the conduct being evaluated was a party's actions in noncompliance with statutory disclosure requirements, by producing late, incomplete expert witness information, and refusing to make the experts available for deposition. This amounted to

14

"a comprehensive attempt to thwart the opposition from legitimate and necessary discovery," justifying exclusion of evidence. (*Zellerino, supra,* 235 Cal.App.3d at p. 1117; see *Stanchfield*, *supra*, 37 Cal.App.4th 1495, 1504-1505.)

In *Boston, supra*, 170 Cal.App.4th 936, the court interpreted section 2034.300 as allowing the trial court to exercise its discretion to exclude expert opinion, when the party offering it "has unreasonably failed to produce expert reports and writings." (*Boston, supra,* at p. 952, citing §§ 2034.270, 2034.300, subd. (c).) "If the trial court concludes that a party intentionally manipulated the discovery process to ensure that expert reports and writings were not created until after the specified date, it may find the failure to produce the reports and writings was unreasonable and exclude the expert's opinions. Accordingly, a party who fails to instruct its expert to create all reports and writings before the specified date does so at its own risk." (*Boston, supra,* at p. 952.)

Also, "[t]he behavior of the party seeking to exclude the expert testimony is relevant to the reasonableness inquiry. If any unfairness arising from the proffering party's late or incomplete disclosure was exacerbated by the party seeking exclusion, the court is less likely to find the conduct of the party offering the expert to be unreasonable." (*Boston, supra*, 170 Cal.App.4th 936, 954.) "[T]he opportunity for meaningful deposition is one of the circumstances the trial court should consider when making the reasonableness determination." (*Ibid*.)

### C. Role of Expert Testimony

For this type of medical negligence action, expert testimony is required for any plaintiff to prevail. The plaintiff must establish "it is more probable than not the

15

negligent act was a cause-in-fact of the plaintiff's injury." (*Jennings*, *supra*, 114 Cal.App.4th 1108, 1118; italics omitted.)  " 'A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.' " (*Ibid.*; italics omitted.)  "[C]ausation in actions arising from medical negligence must be proven within a reasonable medical probability based on competent expert testimony, i.e., something more than a '50-50 possibility.' " (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1504.)  "[T]he evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216.)

Although causation is generally a question of fact for the jury, expert testimony may in some cases preclude a finding of causation by a trier of fact.  In such cases, the causation question is decided as a matter of law.  (See *Duarte v. Zachariah* (1994) 22 Cal.App.4th 1652, 1656-1660; *Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 288-289; *Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 666.)

Because of specialized medical malpractice evidentiary principles, a trial court ruling on a nonsuit request must closely scrutinize the stated facts underlying the expert's declaration of opinion, and cannot take unsupported or speculative opinions at their face value.  (*Jennings, supra*, 114 Cal.App.4th 1108, 1118.)  Nevertheless, Dr. Fischer's declaration here was deemed adequate to withstand the Regents' summary judgment motion on causation issues.  Because of the late designation and the grant of nonsuit, no deposition of Dr. Fischer was conducted, to further test his opinions for their validity, and

16

there was no resolution of this case on the merits.  We are concerned that the trial court treated this set of evidentiary and nonsuit motions as only a renewed summary judgment motion, to justify throwing the case out on the basis of the same declarations as previously presented.  With those concerns in mind, we next examine the record on the application of the statutory criteria of section 2034.720.

## III

### *APPLICATION OF RULES*

The Regents' nonsuit request, as it was guided and shaped by the trial court, challenged the causation element of Plaintiff's professional negligence claim, and asserted that no evidence would support an inference that the delay or manner of treatment of Larry Jr.'s lung ailment "caused" any harm to him.  Under the above standards for consideration of expert testimony, the lack of an available expert doomed Plaintiff's case.  "Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' "  (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839.)  The discretionary ruling disallowing the expert evidence must be evaluated in light of the criteria provided in section 2034.720.  (See *Zellerino, supra,* 235 Cal.App.3d 1097, 1107.)

According to section 2034.720, subdivision (a), on the topic of any reliance by the Regents on the absence of Plaintiff's formal list of expert witnesses, we note that Plaintiff obtained a trial continuance in December 2010, and announced at that time that he had

17

retained a medical expert. During the summary judgment motion proceedings, counsel for the Regents pointed out that Plaintiff had still failed to designate an expert. After summary judgment was denied, Plaintiff gave input to the Regents' counsel for preparation of the joint TRC report, which lists Dr. Fischer as a witness. A week later, Plaintiff served a formal expert designation, which he had apparently prepared March 15.

The December 2010 order that continued the trial referred to "all dates," and Plaintiff could have reasonably relied on that order to believe that the July 2010 designation dates no longer controlled. Although we do not give special weight to his status as a litigant in propria persona, it appears that he was distracted by the ongoing summary judgment proceedings and lost his focus on other technical litigation requirements.

However, there is no indication in the record that this Plaintiff's loss of focus amounted to the kind of gamesmanship or manipulation that has been found to be unworthy of relief from late designations. (See *Zellerino, supra*, 235 Cal.App.3d at p. 1117; *Boston, supra,* 170 Cal.App.4th at p. 954.)

Nor do we base our analysis on any "exacerbation" of the situation by the party seeking exclusion, the Regents. (*Boston, supra*, 170 Cal.App.4th 936, 954.) Instead, we are presented with somewhat ambiguous court orders, and we think the confusion that resulted was to be expected and was not completely unreasonable. For example, the joint TRC report prepared by the parties is at least inaccurate, and at most sloppy and misleading, on the status of the expert designation orders. (See *Stanchfield, supra,* 37

18

Cal.App.4th 1495, 1504 [reasonableness limitation may prevent parties from waiting until trial to raise objections that could have been raised beforehand].)

Regarding the Regents' degree of prejudice or inability to defend on the merits (§ 2034.720, subd. (b)), it is most regrettable that Plaintiff did not comply with disclosure requirements and make Dr. Fischer available earlier for deposition. The Regents justifiably pointed out that Dr. Fischer's declaration was at least somewhat conclusory and speculative, under case law standards. (*Jennings, supra,* 114 Cal.App.4th at pp. 1117-1118.) However, it is possible that more information could be gained at deposition, without undue prejudice to the Regents' defense, except for expenditures of time and money. Under section 2034.720, subdivision (d), an order allowing a tardy designation must be conditioned upon the moving party making the expert available immediately for deposition, and on any other terms as may be just, and the court apparently failed to consider such options. The trial court may have had second thoughts about the previous denial of the summary judgment motion, but these rulings were made in an entirely different legal context, and they required consideration of more than the current adequacy or inadequacy of Dr. Fischer's declaration.

Regarding Plaintiff's required degree of diligence, he showed some justification for his failure to submit the information earlier as the result of mistake, inadvertence, surprise, or excusable neglect. (§ 2034.720, subd. (c)(1).) He notified the court and counsel about his reliance on Dr. Fischer's expert opinion around the time that the order was made continuing trial and "all dates." Once the summary judgment motion was denied, Plaintiff took action to prepare the designation, only to go off track again when

19

settlement discussions were scheduled. Nevertheless, he did not completely hide the ball or thwart discovery. (*Zellerino, supra,* 235 Cal.App.3d 1097, 1117.)

The operative inquiry should be whether Plaintiff's delays and misunderstandings were so egregious as to prevent him from taking advantage of the policy promoting resolution of cases on the merits, and of the main purposes of the discovery statutes: to ascertain the truth; to educate the parties as to the strengths of their claims and defenses; to expedite and facilitate preparation and trial; to prevent delay; and to safeguard against surprise. (*Boston, supra*, 170 Cal.App.4th at p. 950.)

We think the trial court was mistaken about the circumstances as they affected the scope of its discretion. "[I]f the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law." (*City of Sacramento v. Drew, supra*, 207 Cal.App.3d 1287, 1298.) We do not substitute our discretion for that of the trial court, but we do find that the court failed to act in accordance with the statutory guidelines when it terminated the case for these technical procedural problems, in light of the lack of showing of undue prejudice to the Regents, and the availability of lesser remedies under the statute. Under all the relevant circumstances and the statutory guidelines, the trial court's rulings to exclude Plaintiff's expert designation and to grant a nonsuit amounted to an abuse of discretion and error. We reverse.

20

DISPOSITION

The judgment is reversed.  Each party shall bear its own costs on appeal.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.

21