[No. B204628. Second Dist., Div. Four. Jan. 27, 2009.]

LATOYA BOSTON, Plaintiff and Respondent, v.
PENNY LANE CENTERS, INC., Defendant and Appellant.

938

## COUNSEL

Littler Mendelson, Dominic J. Messiha, Elizabeth Nguyen and Meredith Snyder for Defendant and Appellant.

Shegerian & Associates, Carney R. Shegerian; Law Offices of Alfred Hakim, Alfred Hakim; Pine & Pine and Norman Pine for Plaintiff and Respondent.

## OPINION

**EPSTEIN, P. J.**—In this wrongful termination lawsuit, the jury returned a verdict for plaintiff and respondent LaToya Boston. Defendant and appellant Penny Lane Centers, Inc. (Penny Lane), moved for judgment notwithstanding the verdict, or alternatively, a new trial; the trial court denied both motions. Penny Lane appeals from the final judgment on two grounds. It contends, first, that Boston's claim is barred by her failure to exhaust the administrative remedy set forth in Health and Safety Code section 1596.882, and, second, that the trial court committed reversible error by allowing Boston's expert witnesses to testify at trial.

We conclude that Boston did not bring her claim under Health and Safety Code sections 1596.881 and 1596.882, and therefore is not limited to the administrative remedy set forth in section 1596.882. We also conclude that the trial court acted within its discretion by admitting the testimony of Boston's expert witnesses. We shall affirm the judgment.

### FACTUAL AND PROCEDURAL SUMMARY[1]

Penny Lane is a social services agency that operates group homes for juveniles and offers therapy for children and families, among other services. In August 2004, Penny Lane hired Boston to conduct individual and group therapy in the day treatment program. Boston saw clients ranging in age from 12 to 18 years old. Many of her clients had criminal histories and had spent time in juvenile hall or other facilities. Some had histories of moving from group home to group home because of violent behavior.

When she was hired, Boston was told Penny Lane maintained staffing ratios of one staff member for every three clients. This ratio was maintained at first, but in 2005 the number of juveniles receiving therapy in the day

---

[1] "Following the usual rules on appeal after a trial on the merits, we construe the facts, including all conflicting facts, in the light most favorable to the verdict." (*Monroy v. City of Los Angeles* (2008) 164 Cal.App.4th 248, 252, fn. 1 [78 Cal.Rptr.3d 738].)

treatment program increased. The new clients were more volatile and required a higher level of care. Boston told her supervisor, Joy Childress, that the increased number of clients made it difficult for her to do her job and adhere to safety guidelines without additional staff support. Childress told Boston that Penny Lane did not want to spend money on extra staff. Boston was promoted from lead therapist to day treatment coordinator in April 2005.

Lorah Joe replaced Childress as Boston's supervisor in May 2005. Between May and July, Boston saw more than 18 juveniles daily in day treatment, instead of her original client load of two to three. Penny Lane did not increase the number of staff to accommodate the increased client load, despite Boston's insistence that she needed more support due to safety concerns. The increase in clients was accompanied by an increase in incidents, such as fights and furniture being thrown. Boston often was alone with groups of juveniles who would engage in destruction of property and act combatively toward Boston and each other. Boston found it impossible to conduct group therapy sessions, as she had to devote most of the therapy time to "de-escalating and trying to control [crises]." When Boston raised the issue with Joe, she told her to "get over it and stop whining."

On July 11, 2005, a fight broke out between clients in Boston's group therapy. The only other staff member in the room at the time was not qualified to intervene in the altercation. Boston fell to the floor with the two clients who were fighting; she was then run over by the other clients as they "stampede[d]" out the door. Boston suffered a back injury as a result of this incident. She reported the incident to Joe, who told her to "toughen up." Jerardo Majewsky, the manager in charge of quality improvement, conducted an investigation of the incident and prepared a report. Majewsky concluded in the report, "It seems that staff Boston made every attempt to de-escalate the situation to the best of her ability . . . [b]ut due to not having enough staff to do a proper [restraint] . . . staff Boston ended up needing medical attention." Boston sent a letter to Joe around July 19, 2005, regarding her concern that the work environment had become unsafe. In the letter, Boston stated, "I understand that there are budget issues, however, my work environment is no longer safe." Boston received no response to her letter.

Boston's employment was terminated on August 19, 2005. Penny Lane asserted Boston's termination was due to poor performance. Witnesses for Penny Lane testified that Boston allowed her therapist intern certificate to lapse, failed to submit necessary documentation for her patients, and violated safety rules by arriving at work at 4:00 a.m. one morning. Boston believed these reasons were pretextual, particularly since on the same day she was terminated, Joe told Boston she was tired of her complaining.

Boston filed a complaint naming Penny Lane and Joe as defendants. She alleged a violation of Labor Code sections 6310 through 6312; tortious termination in violation of public policy; defamation of character; discrimination based on disability; and harassment based on disability. By the time of trial, only the tortious termination claims remained. Because these claims were asserted against Penny Lane alone, Joe was no longer a named defendant. After a jury trial, a special verdict was returned finding that Boston had been wrongfully terminated in violation of public policy. The jury awarded Boston $500,000 in compensatory damages and $200,000 in punitive damages. Penny Lane moved for judgment notwithstanding the verdict, or alternatively, a new trial. In support of both motions, Penny Lane contended Boston had an exclusive administrative remedy under Health and Safety Code section 1596.882, which she failed to pursue. (Penny Lane had unsuccessfully moved for nonsuit on this basis during trial.) In support of its motion for new trial, Penny Lane also contended the trial court committed prejudicial error by allowing Boston's expert witnesses to testify. The trial court denied Penny Lane's motions and entered judgment for Boston. Penny Lane filed this timely appeal.

## DISCUSSION

### I

Penny Lane first argues for reversal on the ground that "Boston's exclusive remedy for retaliation for complaining about Health and Safety Code violations was pursuant to the Health and Safety Code [sections 1596.881 and 1596.882]."

■ Health and Safety Code sections 1596.881 and 1596.882 are part of the California Child Day Care Facilities Act (the Act), a comprehensive statutory scheme governing the licensing and staffing of various childcare facilities. (Health & Saf. Code, § 1596.70 et seq.) Sections 1596.881 and 1596.882 appear in article 3 of the Act, which pertains to whistleblower protections. (Health & Saf. Code, § 1596.880 et seq.) Section 1596.881 provides that no employer[2] may discriminate against an employee who makes a good faith complaint to a regulatory agency or the employer regarding violations of the law by the employer.[3] Among the specific complaints

---

[2] Health and Safety Code section 1596.880, subdivision (b), clarifies that "employer" refers only to a licensee or agent of a licensee subject to the Act.

[3] "No employer shall discharge, demote, or suspend, or threaten to discharge, demote, or suspend, or in any manner discriminate against any employee who takes any of the following actions: [¶] (a) Makes any good faith oral or written complaint of the violation of any licensing or other laws by the employer to the State Department of Social Services or other agency having statutory responsibility for enforcement of the law or to the employer or representative

addressed in this section is violation of laws relating to staff-child ratios. Section 1596.882 provides that an employee who is discriminated against in violation of section 1596.881 must, in most cases, pursue a grievance through the Division of Labor Standards Enforcement.[4]

Boston does not reference Health and Safety Code sections 1596.881 and 1596.882 anywhere in her complaint, nor did her case at trial rely on Penny Lane having violated the law governing staff-child ratios. Nonetheless, Penny Lane reasons that because Boston's workplace safety concerns had to do with inadequate staffing, Boston is limited as a matter of law to pursuing her claim under Health and Safety Code sections 1596.881 and 1596.882.

We note at the outset that the record is unclear as to whether Penny Lane is subject to the Act. In the trial court, and in the initial briefing submitted to this court, both parties assumed the applicability of the Act. No foundation was laid in the trial court to support this assumption. We requested supplemental briefing from the parties with respect to the applicability of Health and Safety Code sections 1596.881 and 1596.882 in light of Health and Safety Code section 1596.792, subdivision (c), which provides an exception from

---

of the employer. [¶] (b) Institutes, or causes to be instituted, any proceeding against the employer in relation to the violation of any licensing or other laws. [¶] (c) Is, or will be, a witness or testify in a proceeding in relation to the violation of any licensing or other laws. [¶] (d) Refuses to perform work in violation of a licensing law or regulation after notifying the employer of the violation. [¶] Employees shall be notified in writing at the time of employment of their rights under this chapter, as evidenced by their signature on a notification form outlining actions protected by this section. Forms to be utilized for this purpose shall be kept on file at the facility. The department shall provide each facility with the notification forms, which shall include information regarding enforcement pursuant to relevant Labor Code sections. [¶] 'Other laws' for the purposes of this section, includes, but is not limited to, laws relating to staff-child ratios, transportation of children, or child abuse." (Health & Saf. Code, § 1596.881.)

[4] "(a) A claim by the employee alleging the violation by the employer of Section 1596.881 shall be presented to the employer within 45 days after the action as to which complaint is made and presented to the Division of Labor Standards Enforcement not later than 90 days after the action as to which complaint is made. [¶] (b) Upon receipt of the complaint, the Division of Labor Standards Enforcement shall cause whatever investigation to be made as it deems appropriate. [¶] (c) If upon investigation the Division of Labor Standards Enforcement determines that the employer has violated Section 1596.881, it shall bring an action in any appropriate court against the employer. [¶] (d) In any such action, the court shall have jurisdiction, for cause shown, to issue restraining orders and order all appropriate relief, including rehiring and reinstatement of the employee of his or her former position with backpay and benefits. [¶] (e) Within 30 days of the receipt of a complaint pursuant to this section, the Division of Labor Standards Enforcement shall review the facts of the employee's complaint and either set a hearing date or notify the employee and the employer of its decision. Where necessary, the Division of Labor Standards Enforcement shall begin the appropriate court action to enforce the decision. [¶] (f) Except for any grievance procedure or arbitration or hearing that is available to the employee pursuant to a collective bargaining agreement, this section is the exclusive means for presenting claims under this article." (Health & Saf. Code, § 1596.882.)

the Act for "[a]ny community care facility, as defined by [Health and Safety Code] Section 1502."[5] Because this question was not raised in the trial court, no findings of fact were made by that court as to whether Penny Lane is a community care facility as defined in Health and Safety Code section 1502. In their supplemental briefs, the parties disagree as to whether Penny Lane falls within this exception.[6] The record before this court is inadequate to resolve the question; however, we need not resolve it in light of our conclusion that the Act, even if applicable, does not bar Boston's action for wrongful discharge in violation of the public policy favoring workplace safety. We assume for the sake of the following discussion only that Penny Lane is subject to the Act.

We turn to the merits of Penny Lane's argument. Penny Lane argues that Boston's claim is within the scope of Health and Safety Code sections 1596.881 and 1596.882, because these sections encompass retaliation for reporting violations of "other laws," including "laws relating to staff-child ratios." According to Penny Lane, Boston's use of staff-child ratios as evidence of an unsafe work environment brings her retaliation complaint within the scope of these provisions. Penny Lane argues that Boston is therefore limited to the administrative remedy set forth by the Act. Its argument relies heavily on subdivision (f) of section 1596.882, which provides, "Except for any grievance procedure or arbitration or hearing that is available to the employee pursuant to a collective bargaining agreement, this section is the exclusive means for presenting claims under this article." (Health & Saf. Code, § 1596.882, subd. (f).) In its discussion of the exclusivity provision in Health and Safety Code section 1596.882, subdivision (f), Penny Lane focuses entirely on the words "exclusive means for presenting claims" while ignoring the qualifying phrase "under this article." Boston argues that she did not bring her claim "under this article."

■ "In addressing this issue we begin, as always, with the language of the statute itself. '[A] court is to construe a statute so as to effectuate the

---

[5] Health and Safety Code section 1502, subdivision (a), defines " '[c]ommunity care facility' " as "any facility, place, or building that is maintained and operated to provide nonmedical residential care, day treatment, adult day care, or foster family agency services for children, adults, or children and adults, including, but not limited to, the physically handicapped, mentally impaired, incompetent persons, and abused or neglected children, and includes [specified facilities and programs]."

[6] In addition to addressing the question of the Act's applicability, Penny Lane's supplemental brief also raises a new argument that Boston was under a contractual obligation to Penny Lane to present her claim to the Division of Labor Standards Enforcement. We do not address the merits of this argument. To entertain a theory of the case raised by Penny Lane for the first time in a supplemental appellate brief would be unfair to Boston, who had no opportunity to respond either in the trial court or on appeal. (See *Expansion Pointe Properties Limited Partnership v. Procopio, Cory, Hargreaves & Savitch, LLP* (2007) 152 Cal.App.4th 42, 54–55 [61 Cal.Rptr.3d 166].)

purpose of the law.' [Citation.] However, '[w]hen statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it.' " (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 73 [276 Cal.Rptr. 130, 801 P.2d 373].) In *Rojo v. Kliger*, our Supreme Court considered the preemptive effect of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) on nonstatutory employment discrimination claims. The court found the statutory language was clear and unambiguous regarding preemption, because FEHA expressly disclaimed any intent to repeal other state laws relating to discrimination. (*Rojo v. Kliger, supra*, at p. 73.) In the present case, the statutory language is less clear. Although Health and Safety Code section 1596.882 expressly preempts other claims brought under the article in which it appears, the language is silent as to nonstatutory claims. The parties have not identified, nor have we found, any case interpreting the preemptive scope of Health and Safety Code sections 1596.881 and 1596.882.

The Act governs child daycare facilities and was intended to facilitate the Legislature's goal of "provid[ing] a comprehensive, quality system for licensing child day care facilities to ensure a quality day care environment." (Health & Saf. Code, § 1596.72, subd. (b).) The purpose section of the Act references the well-being of parents and children, but not the well-being of workers. (Health & Saf. Code, § 1596.73.) In fact, the statement of purpose speaks of workers in the daycare system only with regard to their "knowledge and understanding of children and child care needs" and their need for "technical assistance about licensing requirements." (Health & Saf. Code, § 1596.73, subds. (b), (c).) This language indicates the statutory scheme was enacted for the benefit of children and their parents. Any benefit to workers is incidental to the safe and successful operation of the facilities. The legislative history cited by Penny Lane does not compel a different conclusion about the legislative intent behind the Act. According to the legislative history, the antiretaliation provisions in the bill were included because "[g]iven the resource constraints on licensing investigators, employees can provide necessary on-site protection against licensing and other violations." (Assem. Com. on Human Services, 3d reading analysis of Assem. Bill No. 1040 (1987–1988 Reg. Sess.) as amended May 11, 1987.) The bill was thus intended to encourage employees of childcare facilities to monitor licensing violations without fear of retaliation. This is consistent with a statutory scheme intended to protect children by enforcing licensing requirements for childcare providers.

Boston did not claim that she was retaliated against for reporting licensing violations or for reporting illegal staff-child ratios. The language of her complaint reveals a broader range of workplace safety concerns: "On or about October, 2004, Plaintiff verbally complained about her safety at the therapy sessions. In April 2005, she complained both orally and in writing to her

supervisor, Lorah Joe, about the understaffing of the group therapy session, where she was left alone with as many as twenty juveniles convicted of assault, battery, and carjacking, in one room and they would get out of hand and pose a danger to her and the other patients. She also complain[ed] that the therapy room was not large enough to accommodate twenty juveniles, therefore, it created additional safety hazards to her and other patients." The complaint later alleges that Boston "reported to her supervisors several safety and health violations of about [*sic*] safety issues and staff to client ratio, which constituted hazardous conditions to Plaintiff and others" and was retaliated against "in violation of the public policy of the State of California as reflected in the Labor Code §§ 6310–6312." Evidence to support the allegations in the complaint was introduced at trial, including testimony about the dangerous character of the juveniles in Boston's care and the crowded room in which she was expected to work with these juveniles. Although Boston did allege regulatory violations in her complaint, the portion of the complaint quoted here shows that the complaints she made to her supervisors went beyond noncompliance with staffing regulations. Between the allegations in the complaint and the evidence put on at trial, it is evident that the gravamen of Boston's claim is that she was retaliated against for complaining about an unsafe work environment.

■ Penny Lane asserts that Boston was incorrect about the legally mandated staff-to-client ratio and emphasizes that no evidence was presented at trial to establish that Penny Lane violated this mandate. This argument actually supports the conclusion that Boston's claim had to do with her own safety, not whether Penny Lane violated staffing regulations. Boston's claim that she was fired in retaliation for complaining about an unsafe work environment does not depend upon Penny Lane being out of compliance with legally mandated staff-child ratios. (See *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 299–300 [188 Cal.Rptr. 159] ["[A]n employee is protected against discharge or discrimination for complaining in good faith about working conditions or practices which he reasonably believes to be unsafe, whether or not there exists at the time of the complaint an [Occupational Safety and Health Act] standard or order which is being violated."].) That understaffing was one reason Boston felt unsafe, along with the volatile clientele and crowded therapy space, does not require a different result. The heart of Boston's claim is not whether she was retaliated against for objecting to Penny Lane's noncompliance with staffing ratios; it is whether Boston was retaliated against for objecting to an unsafe working environment.[7]

---

[7] This conclusion is supported by the questions that were put to the jury in the special verdict form. With regard to Boston's claim for wrongful termination of employment in violation of public policy, the jury was asked the following six questions: (1) "Was plaintiff employed by Penny Lane Centers?" (2) "Was plaintiff Boston discharged?" (3) "Was plaintiff Boston's complaint(s) about safety in her work place a motivating factor in defendant Penny

■ Our Supreme Court has recognized that "at-will employees may recover tort damages from their employers if they can show they were discharged in contravention of fundamental public policy." (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 71 [78 Cal.Rptr.2d 16, 960 P.2d 1046]; see also *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330].) Because the Legislature is vested with the responsibility to declare the public policy of the state, the wrongful termination claim must be " 'tethered to fundamental policies that are delineated in constitutional or statutory provisions.' " (*Green v. Ralee Engineering Co., supra,* 19 Cal.4th at p. 71.) Boston tethered her claim to the protections embodied in the California Occupational Safety and Health Act of 1973 (Cal-OSHA) (Lab. Code, § 6300 et seq.). ■ Cal-OSHA specifically prohibits retaliation against an employee who makes a complaint with reference to employee safety or health. (Lab. Code, § 6310.)

■ "Where a statute creates a right that did not exist at common law, and provides a comprehensive system of administrative enforcement, a requirement that administrative remedies be exhausted may be implied. [Citation.] But, generally, 'where a statutory remedy is provided for the enforcement of a preexisting *common-law* right, the newer statutory remedy will be considered only cumulative.' " (*Hentzel v. Singer Co., supra,* 138 Cal.App.3d at p. 303; see also 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 9, p. 71.) ■ Though Cal-OSHA created a statutory right of action for workplace safety claims, it did not extinguish the common law tort of wrongful termination in violation of the public policy in favor of workplace safety. (*Hentzel v. Singer Co., supra,* at p. 303; *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 107 [80 Cal.Rptr.2d 60] [" 'An employer who fires an employee in retaliation for protesting unsafe working conditions violates fundamental public policy, and the discharged employee may bring a tort action for wrongful discharge in addition to his or her statutory remedies.' "].) Consequently, Boston could, and did, vindicate her right to a safe workplace using the common law tort of wrongful discharge, which preexisted and was separate from the cause of action created by Health and Safety Code sections 1596.881 and 1596.882.

We conclude that Boston did not bring her claim under the Act, and her claim is not barred by Health and Safety Code sections 1596.881 and 1596.882.

Lane Center's decision to discharge Ms. Boston?" (4) "Did the discharge cause plaintiff Boston harm?" (5) "What are plaintiff Boston's damages for this claim?" (6) "Has plaintiff Boston proved by clear and convincing evidence that Penny Lane Centers acted with malice or oppression in wrongfully terminating her employment in violation of public policy?" None of the questions on the special verdict form referenced staff-child ratios.

## II

Penny Lane next contends the trial court committed reversible error by allowing Boston's expert witnesses to testify at trial. According to Penny Lane, Boston failed to timely produce her experts' reports and writings in compliance with Code of Civil Procedure[8] section 2034.270.[9]

On July 3, 2007, Penny Lane served a demand on Boston for a simultaneous exchange of information concerning all expert witnesses. The demand included a request for production of all discoverable reports and writings made by the expert witnesses in the course of preparing the experts' opinions, as authorized by section 2034.210, subdivision (c).[10] July 23, 2007, was the specified date for the mutual exchange of information, pursuant to section 2034.230, subdivision (b). On July 23, 2007, the parties exchanged expert witness designations. Penny Lane stated that it "[did] not presently intend to offer the testimony of any expert witness at the trial." Boston's designation included the names of two retained experts, Dr. Franklin C. Milgrim and Dr. Craig Snyder, and two nonretained experts. Boston provided a declaration with narrative statements and representations regarding the qualifications and scope of testimony of Dr. Milgrim and Dr. Snyder, as required by section 2034.260.[11] Boston did not produce any reports or writings prepared by her expert witnesses. The record does not reveal whether any further communication regarding expert reports and writings took place between July 23 and August 23, 2007. Penny Lane did not depose either designated expert witness.

---

[8] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[9] "If a demand for an exchange of information concerning expert trial witnesses includes a demand for production of reports and writings as described in subdivision (c) of Section 2034.210, all parties shall produce and exchange, at the place and on the date specified in the demand, all discoverable reports and writings, if any, made by any designated expert described in subdivision (b) of Section 2034.210." (§ 2034.270.)

[10] "After the setting of the initial trial date for the action, any party may obtain discovery by demanding that all parties simultaneously exchange information concerning each other's expert trial witnesses to the following extent: [¶] (a) Any party may demand a mutual and simultaneous exchange by all parties of a list containing the name and address of any natural person, including one who is a party, whose oral or deposition testimony in the form of an expert opinion any party expects to offer in evidence at the trial. [¶] (b) If any expert designated by a party under subdivision (a) is a party or an employee of a party, or has been retained by a party for the purpose of forming and expressing an opinion in anticipation of the litigation or in preparation for the trial of the action, the designation of that witness shall include or be accompanied by an expert witness declaration under Section 2034.260. [¶] (c) Any party may also include a demand for the mutual and simultaneous production for inspection and copying of all discoverable reports and writings, if any, made by any expert described in subdivision (b) in the course of preparing that expert's opinion." (§ 2034.210.)

[11] See footnote 14, *post.*

Around August 23, 2007, Boston turned over to Penny Lane seven pages of handwritten notes from Dr. Milgrim. Around August 30, 2007, Boston turned over to Penny Lane a report prepared by Dr. Snyder. Penny Lane then filed a motion in limine to exclude opinion testimony and reports from Dr. Milgrim and to exclude reports from Dr. Snyder. Its motion was based on section 2034.300.[12] In support of the motion, Penny Lane contended that Boston had failed to timely comply with the requirements of section 2034.270 for the production of expert reports and writings.

A hearing on the motion was held at the final status conference on September 7, 2007. Penny Lane argued that section 2034.270 is violated, triggering the exclusion sanction in section 2034.300, if reports and writings are turned over after the date specified for designation of experts, even if those reports and writings had not existed at the specified date. Boston responded that section 2034.270 only required production of reports and writings in existence on the specified date. According to Boston, no reports or writings had been created by her experts as of the specified date.[13] Penny Lane did not (and does not now) contend that there were any reports or writings in existence as of that date.

The trial court concluded that Boston's failure to turn over the discoverable writings on the specified date was not a violation of section 2034.270 since the reports and writings were not in existence on that date. The court also found Boston's conduct was not unreasonable. Consequently, the exclusion sanction under section 2034.300 would not have been imposed even if Boston had violated section 2034.270. Since the hearing was held on a Friday and the trial was to commence the following Monday, the trial court ordered Boston to make her expert witnesses available over the weekend if Penny Lane wished to depose them. Penny Lane did not depose either witness. Both witnesses offered their expert opinions at trial.

---

[12] "Except as provided in Section 2034.310 and in Articles 4 (commencing with Section 2034.610) and 5 (commencing with Section 2034.710), on objection of any party who has made a complete and timely compliance with Section 2034.260, the trial court shall exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to do any of the following: [¶] . . . [¶] (c) Produce reports and writings of expert witnesses under Section 2034.270. . . ." (§ 2034.300.)

[13] A declaration signed by one of Boston's attorneys was attached to Boston's opposition to the motion to exclude expert opinion testimony and reports. The declaration stated, in relevant part, "3. Dr. Milgrim did not examine plaintiff until July 23, 2007. He also examined her on July 30 and August 6, 13, 20, and 22, for evaluation. Dr. Milgrim has not produced a report. [Boston's other attorney's] office received Dr. Milgrim's notes and writings on or about August 23, 2007. On the same date, the writings were forwarded to defense counsel's office. [¶] 4. Dr. Craig Snyder saw Ms. Boston for psychological testing for the first time on August 8, 2007. On August 27, 2007, Dr. Snyder prepared a report based on his examination. It was received by my office on August 29, 2007, and forwarded to defense counsel on August 30, 2007."

■ As a preliminary matter, we disagree with Boston's assertion that Penny Lane forfeited any claim of error with regard to the trial court's admission of expert testimony by failing to depose Boston's experts, retain its own experts, or ask for a continuance. Penny Lane moved before trial to exclude the expert testimony. The motion in limine was argued before the trial court and denied. "[A] motion *in limine* to exclude evidence is a sufficient manifestation of objection to protect the record on appeal when it satisfies the basic requirements of Evidence Code section 353, i.e.: (1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context." (*People v. Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588].) Penny Lane's motion satisfied these requirements.

We generally review the trial court's ruling on a motion to exclude an expert's opinion for abuse of discretion. (*Dickison v. Howen* (1990) 220 Cal.App.3d 1471, 1476 [270 Cal.Rptr. 188].) "[D]iscretion is always delimited by the statutes governing the particular issue." (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1107 [1 Cal.Rptr.2d 222].) But, "when the exclusion of expert testimony rests on a matter of statutory interpretation, we apply de novo review." (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 25 [9 Cal.Rptr.3d 486].) To the extent that the question presented requires us to interpret section 2034.270, we apply de novo review. We review the trial court's reasonableness determination under section 2034.300 for abuse of discretion.

■ "When construing a statutory scheme, our primary guiding principle is to ascertain the intent of the Legislature to effectuate the purpose of the law." (*Schweitzer v. Westminster Investments, Inc.* (2007) 157 Cal.App.4th 1195, 1204 [69 Cal.Rptr.3d 472].) We "attempt to give effect to statutes according to the usual, ordinary import of the language employed in framing them . . . and we construe the statutory language in its context, keeping in mind the nature and purpose of the statute in which they appear . . . ." (*Ibid.,* citation omitted.) The statutes governing expert witness discovery are part of the Civil Discovery Act (§ 2016.010 et seq.). The purposes of the discovery statutes are "to assist the parties and the trier of fact in ascertaining the truth; to encourage settlement by educating the parties as to the strengths of their claims and defenses; to expedite and facilitate preparation and trial; to prevent delay; and to safeguard against surprise." (*Beverly Hospital v. Superior Court* (1993) 19 Cal.App.4th 1289, 1294 [24 Cal.Rptr.2d 238].)

The Supreme Court has noted that the need for pretrial discovery is greater with respect to expert witnesses than ordinary fact witnesses because the opponent must prepare to cope with the expert's specialized knowledge. (*Bonds v. Roy* (1999) 20 Cal.4th 140, 147 [83 Cal.Rptr.2d 289, 973 P.2d 66].) The Legislature responded to this need by enacting detailed procedures for discovery pertaining to expert witnesses. (See § 2034.210 et seq.) Upon the demand of any party, all parties must exchange written information about their expert trial witnesses. (§ 2034.210.) The information must include a sworn declaration containing, among other things, a brief narrative statement of the general substance of the testimony the expert is expected to give. (§ 2034.260, subd. (c).) A party may also demand production of any discoverable reports and writings made by expert witnesses in the course of preparing their opinions. (§ 2034.210, subd. (c).) "This allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area." (*Bonds v. Roy, supra*, 20 Cal.4th at pp. 146–147.)

As to the timing of disclosure, section 2034.230, subdivision (b), provides, "The demand shall specify the date for the exchange of lists of expert trial witnesses, expert witness declarations, and any demanded production of writings. The specified date of exchange shall be 50 days before the initial trial date, or 20 days after service of the demand, whichever is closer to the trial date, unless the court, on motion and a showing of good cause, orders an earlier or later date of exchange." Section 2034.270 specifically addresses the timing of disclosure of reports and writings, if demanded: "all parties shall produce and exchange, at the place and on the date specified in the demand, all discoverable reports and writings, if any, made by any designated expert . . . ." Neither this provision nor any other requires that expert witnesses refrain from creating new or additional reports or writings after the specified date.

The statutory scheme includes detailed procedures to be followed if a party wishes to augment its expert witness list to add new witnesses or amend the general substance of the testimony the expert is expected to give. (§ 2034.610.) Similarly, there are procedures to be followed if a party fails to turn over the expert witness information described in section 2034.260 by the specified date, but wishes to remedy the error with tardy submission of an expert witness list. (§§ 2034.710, 2034.720.) There is not, however, any statutory procedure for turning over expert reports and writings created after the specified date when the rest of the expert witness information was timely produced. Since the Legislature provided a method to amend the declaration (§ 2034.610, subd. (a)(2)), it apparently anticipated that expert witnesses might prepare their opinions after the specified date. Yet it chose not to address reports and writings created as part of the ongoing preparation.

 We cannot, as Penny Lane implicitly invites us to do, declare a rule that expert reports and writings must be created by the specified exchange date or not at all. As explained, the Legislature appears to have anticipated that experts would continue their preparations after the specified date. We are not at liberty to read into the statute a restriction on such activity where none exists. " '[I]n construing [a] statut[ory] provision[] a court is not authorized to insert qualifying provisions not included and may not rewrite the statute to conform to an assumed intention which does not appear from its language.' " (*Napa Valley Wine Train, Inc. v. Public Utilities Com.* (1990) 50 Cal.3d 370, 381 [267 Cal.Rptr. 569, 787 P.2d 976].)

That we find no statutory prohibition against the continued creation of expert reports and writings after the specified date does not mean that a trial court is powerless to prevent or respond to abuse of expert witness discovery procedures. As a general matter, the trial court is empowered to exercise superintendency over discovery. (See *People v. Superior Court* (*Cheek*) (2001) 94 Cal.App.4th 980, 991 [114 Cal.Rptr.2d 760] ["Recognizing that discovery procedures are subject to misuse, the Civil Discovery Act authorizes the trial court to limit discovery where appropriate."].) For example, section 2019.020, subdivision (b) provides that, "on motion and for good cause shown, the court may establish the sequence and timing of discovery for the convenience of parties and witnesses and in the interests of justice." With regard to expert witness discovery in particular, section 2034.250, subdivision (b) states, in relevant part, "The court, for good cause shown, may make any order that justice requires to protect any party from unwarranted annoyance, embarrassment, oppression, or undue burden and expense. The protective order may include, but is not limited to, one or more of the following directions: [¶] . . . [¶] (3) That the exchange be made only on specified terms and conditions. [¶] (4) That the production and exchange of any reports and writings of experts be made at a different place or at a different time than specified in the demand." Accordingly, on the motion of a party, a trial court may issue a protective order requiring that all expert reports and writings be created and produced by a specified exchange date.

 Additionally, section 2034.300 empowers the court to exclude the expert opinion of any witness offered by a party who has *unreasonably* failed to produce expert reports and writings as required by section 2034.270. (§ 2034.300, subd. (c).) If the trial court concludes that a party intentionally manipulated the discovery process to ensure that expert reports and writings were not created until after the specified date, it may find the failure to produce the reports and writings was unreasonable and exclude the expert's opinions. Accordingly, a party who fails to instruct its expert to create all reports and writings before the specified date does so at its own risk.

In this case, the trial court specifically found that Boston's production of expert reports and writings after the specified date was not unreasonable. Penny Lane does not contend that Boston engaged in a pattern of behavior designed to impede expert discovery. Nor does the record indicate that Boston was acting in bad faith when she was examined by her experts after the specified date or that she instructed her experts to delay the creation of their reports and writings. Once Boston's attorneys received the reports and writings from their experts, they turned them over to Penny Lane within about a day. (Cf. *Zellerino v. Brown, supra*, 235 Cal.App.3d at pp. 1116–1117 [failure to produce reports and writings on specified date unreasonable when the noncompliant party produced expert witness information that was late and incomplete, and refused to make her experts available for deposition, in a "comprehensive attempt to thwart the opposition from legitimate and necessary discovery"].)

Penny Lane was given timely notice of the identity of Boston's experts and the general substance of their expected testimony, because Boston turned over all of the information required by section 2034.260,[14] including the expert witness declaration, on the specified date. Nonetheless, Penny Lane opted not to depose the experts and did not counterdesignate any experts of its own. Even after receiving the reports and writings from Boston's experts, Penny Lane did not take their depositions, despite being given leave by the trial court to do so. Penny Lane now argues that depositions taken within a week of trial would have been useless because the deadline for counterdesignating its own experts already had passed. But Penny Lane could have sought a continuance or leave to make a late designation; it did neither.

Comments made by Larry Baron, Penny Lane's trial counsel, at the hearing on the exclusion motion reveal that Penny Lane made a strategic

---

[14] "(a) All parties who have appeared in the action shall exchange information concerning expert witnesses in writing on or before the date of exchange specified in the demand. The exchange of information may occur at a meeting of the attorneys for the parties involved or by a mailing on or before the date of exchange. [¶] (b) The exchange of expert witness information shall include either of the following: [¶] (1) A list setting forth the name and address of any person whose expert opinion that party expects to offer in evidence at the trial. [¶] (2) A statement that the party does not presently intend to offer the testimony of any expert witness. [¶] (c) If any witness on the list is an expert as described in subdivision (b) of Section 2034.210, the exchange shall also include or be accompanied by an expert witness declaration signed only by the attorney for the party designating the expert, or by that party if that party has no attorney. This declaration shall be under penalty of perjury and shall contain: [¶] (1) A brief narrative statement of the qualifications of each expert. [¶] (2) A brief narrative statement of the general substance of the testimony that the expert is expected to give. [¶] (3) A representation that the expert has agreed to testify at the trial. [¶] (4) A representation that the expert will be sufficiently familiar with the pending action to submit to a meaningful oral deposition concerning the specific testimony, including any opinion and its basis, that the expert is expected to give at trial. [¶] (5) A statement of the expert's hourly and daily fee for providing deposition testimony and for consulting with the retaining attorney." (§ 2034.260.)

decision not to depose Boston's experts: "THE COURT: Why, when you got these reports on [August] 24th and then the 30th did you not notice the depositions of these two experts?

"MR. BARON: A couple reasons. One is it was on the eve of trial. We're in the middle of trial preparation. Number two, these experts charge $750 an hour for their time at deposition. Our client can ill afford to pay for those depositions.

"THE COURT: So you decided to put all your eggs into this motion basket as opposed to proceeding on parallel tracks and deposing the witnesses while simultaneously moving to preclude their testimony.

"MR. BARON: Exactly, Your Honor."

■■■ The behavior of the party seeking to exclude the expert testimony is relevant to the reasonableness inquiry. If any unfairness arising from the proffering party's late or incomplete disclosure was exacerbated by the party seeking exclusion, the court is less likely to find the conduct of the party offering the expert to be unreasonable. (See *Stanchfield v. Hamer Toyota, Inc.* (1995) 37 Cal.App.4th 1495, 1503 [44 Cal.Rptr.2d 565] [finding that when expert was not fully prepared at deposition, but proponent offered to make expert available within one or two days, opponent acted unreasonably by failing to take any action until he moved for exclusion of the expert in the middle of trial]; see also Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2008) ¶ 8:1712, p. 8J-30 (rev. # 1, 2007) ["There is no statutory requirement that the objecting party give the opposing party opportunity to correct the defects before trial. But failure to do so may be ground for finding that the opposing party's failure to comply was not 'unreasonable.' "].)

We do not suggest that a party's conduct with regard to production of expert reports and writings is necessarily reasonable as long as the opposing party is given an opportunity to depose the expert. Rather, the opportunity for meaningful deposition is one of the circumstances the trial court should consider when making the reasonableness determination. In this case, Penny Lane admitted it had made a strategic choice not to depose Boston's expert witnesses for financial reasons. The trial court appropriately considered this, along with Boston's prompt production of the reports once received, and concluded that Boston had not unreasonably failed to produce her experts' reports and writings. Under the circumstances, we do not find that it was an abuse of discretion for the trial court to deny Penny Lane's motion to exclude Boston's expert witnesses' opinions.

## DISPOSITION

The judgment is affirmed. Boston shall have her costs on appeal.

Manella, J., and Suzukawa, J., concurred.