Filed 12/22/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| IAIN PARUIG FANCOURT MCDONALD,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>AREG ZARGARYAN et al.,<br><br>　　　Defendants and Appellants. | B329565, B331191<br><br>Los Angeles County<br>Super. Ct. No. 18STCV10066 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael B. Harwin, Judge. Judgment vacated and case remanded.

Wilshire Law Firm, Jonathan C. Teller, Sutton Shapiro; Esner, Chang, Boyer & Murphy, Holly N. Boyer, Shea S. Murphy, Kevin K. Nguyen for Plaintiff and Respondent.

Gibson, Dunn & Crutcher, Kristin A. Linsley, Bradley J. Hamburger, Daniel R. Adler, Zachary C. Freund, Alison M. Johnson for Defendants and Appellants.

_____

Seven days before trial, counsel for plaintiff Iain McDonald blindsided the defense with a new medical expert with a new medical theory. No emergency or extraordinary development justified this last-minute development. We vacate the judgment and remand for a new trial. Statutory citations are to the Code of Civil Procedure.

I

McDonald's accident was in *2017*. At about "walking speed" defendant driver Areg Zargaryan ran into McDonald on his motorcycle. McDonald did not fall to the ground. He walked to the sidewalk without assistance and left the scene without receiving medical attention. The next day, McDonald went to a clinic and reported pain in his right hip, leg, and foot—but not in his neck or groin. McDonald later claimed the accident created debilitating and long lasting pain by injuring his neck and groin. The defense contested this account of excruciating pain, pointing out McDonald after the accident continued snowboarding, rollerblading, and motorcycling.

In September *2021*, the parties exchanged expert designations. McDonald listed 29 experts. Dr. Toorag Gravori was not among them. Later that same month, McDonald named an additional expert—again, not Gravori.

Trial began in *2023*. The delay was due to the pandemic and other causes. The first day of trial was Friday, January 27, 2023.

*The week before trial* and 16 months after the exchange of expert information, on Wednesday, January 18, 2023, McDonald visited Gravori. Gravori was a new doctor for McDonald. That same day, Gravori wrote a report recommending spine surgery

for McDonald. Until then, no one had proposed spine surgery for McDonald. Spine surgery had not been an issue in the case.

No new medical ailment or symptom prompted McDonald's belated visit to Gravori. Gravori's detailed report about McDonald mentioned nothing about a recent increase in pain or some other new medical development that caused McDonald to time his visit for the brink of trial. Gravori did testify, however, that McDonald's trial attorney previously had retained him in other matters and that Gravori had testified as an expert for McDonald's trial attorney in those unrelated matters. That is to say, McDonald's trial lawyer had a professional relationship with Gravori.

McDonald himself did not claim his condition, six years after the accident, had worsened just before trial. Rather, he went rollerblading the day before he went to Gravori. McDonald also went rollerblading the day afterwards.

When asked whether his *attorney* had referred McDonald to Gravori, McDonald said the following: "I don't recall, but possibly. Maybe. I think so, before the trial. We just wanted to make sure that I was in the right place. And essentially let myself know what my choices are."

As mentioned, trial was starting that Friday, January 27, 2023. On Friday, January 20, 2023, at 4:01 PM, a paralegal in the law office representing McDonald emailed Zargaryan's attorney with this message:

"Hello,

"Please see the attached.

"Thanks!"

The attachment apparently was Gravori's report on McDonald and Gravori's spine surgery recommendation.

3

This last-minute development triggered a flurry of activity.

On Tuesday, January 24, 2023, McDonald emailed Zargaryan a document titled "Plaintiff's Further Supplemental Disclosure Of Expert Witness Of New Treating Doctors." McDonald did not file this document with the court.

McDonald did not move for leave of court to augment his witness list, either under subdivision (a)(1) of section 2034.610, or under any other statute.

The next day, on Wednesday, January 25, 2023, Zargaryan filed a motion in limine protesting McDonald's tactic of adding the last-minute expert. This surprise expert was, the motion argued, a tardy effort to sandbag Zargaryan on the brink of trial. Zargaryan asked the court to exclude Gravori.

On the first day of trial, on Friday, January 27, 2023, McDonald opposed Zargaryan's motion in limine.

The trial court heard Zargaryan's motion on Tuesday, January 31, 2023. The court ruled Gravori could testify if "he's immediately made available for deposition at Plaintiff's expense. If [Gravori] is made available and Plaintiff takes the deposition, then [Gravori] may testify."

The parties deposed Gravori the night of February 1, 2023, and returned to court the next day. The court and the parties at this point were in the thick of jury selection. Zargaryan renewed his motion to exclude Gravori, noting McDonald's attorney previously had retained Gravori as a testifying expert.

The court stated its "ruling will remain." That is, the trial court allowed Gravori to testify.

The jury returned a substantial award for McDonald.

Zargaryan appealed on many grounds, including that the court erred by permitting Gravori to testify.

4

## II

The question is whether the trial court abused its discretion by allowing this tardy expert to testify.  (See *Bonds v. Roy* (1999) 20 Cal.4th 140, 149 (*Bonds*).)  The answer is yes.  There was no reasonable explanation for McDonald's delay.

Zargaryan's comprehensive motion in limine against Gravori preserved this issue for review.  (See *Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950.)  It was not essential for Zargaryan to move for a continuance.  (*Ibid.*)

The merits of the decisive issue concern expert witness disclosure.  We review the goal and content of California's statutory scheme governing presentation of evidence in the case-in-chief.

The goal is to avoid surprise at trial.  (*Staub v. Kiley* (2014) 226 Cal.App.4th 1437, 1444, 1447 (*Staub*); see also *Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 781 (*Deyo*) ["discovery laws were designed to prevent trial by ambush"].)

Surprise at trial is *unfair*.  It also is *inefficient*.

Surprise at trial is *unfair* because ambushes, while effective in warfare, are disfavored in court.  For legal disputes, California has replaced free-for-all trial by combat with rules of professionalism and fair play.  (E.g., *Deyo, supra,* 84 Cal.App.3d at p. 781.)

Surprise at trial is *inefficient* because, if both sides know exactly what evidence the trial will produce, they have a better chance of agreeing in advance on the true value of the case.  This promotes settlement.  Cards up the sleeve make settlement less likely.  The concealing side can think its trial odds are better than the other side realizes and may demand more to settle than the other side, left in the dark, thinks the case is worth.  (See,

5

e.g., Prescott & Spier, *A Comprehensive Theory of Civil Settlement* (2016) 91 N.Y.U.L. Rev. 59, 75–78.)

As courts know so well, settlement is efficient.  It saves the resources of the parties, the judicial system, and the jurors.  By avoiding these costs, a handshake in willing agreement is better than years of litigation.

The goal of avoiding surprise in the case-in-chief is especially important when the trial witnesses are experts.  Our Supreme Court has explained that the "statutory scheme as a whole envisions timely disclosure of the general substance of an expert's expected testimony so that the parties may properly prepare for trial.  Allowing new and unexpected testimony for the first time at trial so long as a party has submitted any expert witness declaration whatsoever is inconsistent with this purpose." (*Bonds, supra,* 20 Cal.4th at p. 148.)

Surprise experts are tremendously abusive because experts can be such powerful witnesses.  Time-consuming homework can be essential to challenge a true expert.  Courts must view ambushes with tardy new experts with stern disapproval, for witnesses who are genuine experts can be extremely dangerous for the other side.  Jamming the opposition for preparation time can be successful, if the judge allows this unfair tactic.

Experienced trial lawyers know this routine all too well.  True experts can bring a brilliant mind, a record of achievement that inspires awe, and a practiced and winning persona to the witness stand.  Genuine experts, counsel appreciate, may be considerably smarter and better versed in the field than counsel themselves.  True experts can use direct eye contact and authoritative prose to deliver what amounts to an opening statement and a closing argument for their side, right in the

6

middle of trial.  Skillful use of hypothetical questions can have a show-stopping effect.  And as the revered Judge Henry Friendly wrote, the technical character of expert testimony can convey "a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." (*Herman Schwabe, Inc. v. United Shoe Machinery Corp.* (2d Cir. 1962) 297 F.2d 906, 912.)

Preparing a cross-examination to combat this potential devastation can require laborious preparation:  immersion in abstruse publications, mastery of arcane concepts, and private schooling from your own counter-experts.  This preparation then leads up to the vital expert deposition, where the task is, with the camera rolling, to reveal the assumptions, to expose the contradictions, and to lay the groundwork for effective cross-examination before the jury.  (See, e.g., *Bonds, supra,* 20 Cal.4th at p. 147 [counsel must "gear up" to cross-examine an opposing expert].)

As a result, deliberately rushing the other side's preparation is odious.  Trial judges do right by spotting and squelching this foul tactic.

To achieve its expert disclosure goal, the statute requires those parties exchanging expert witness information to do so in writing by the date specified in the demand.  This exchange shall include a list of people whose expert opinion that party expects to offer in evidence at trial.  (§ 2034.260, subds. (a)-(b).)  Parties may designate supplemental experts within 20 days after the exchange described in section 2034.260.  (§ 2034.280, subd. (a).)

After that, a party seeking to designate additional experts must file a motion seeking leave of court to augment its expert witness list.  (§ 2034.610, subd. (a)(1).)  A noticed motion seeking

court permission is essential.  (*Richaud v. Jennings* (1993) 16 Cal.App.4th 81, 90 (*Richaud*).)  This motion practice requires the proponent to demonstrate good cause for the delay and correspondingly allows the opponent to explain the prejudice the late hit might cause.  Hearing the motion enables the court to gain an overview and to minimize disruption of the litigation.  (*Id.* at p. 92; cf. *Bonds, supra*, 20 Cal.4th at p. 149 [parties *must* move for leave to amend if they seek to expand the scope of expert testimony beyond what was previously disclosed].)

Failure to comply with this statutory scheme can have drastic consequences.  (*Staub, supra,* 226 Cal.App.4th at p. 1445.)

In this case, McDonald flouted these rules.

By code, McDonald needed court permission to add his new expert Gravori.  McDonald did not file the mandatory motion.  (See § 2034.610, subd. (a)(1).)  He failed to seek court permission.

Zargaryan promptly and properly moved to exclude Gravori under section 2034.300 because McDonald unreasonably failed to disclose Gravori in a timely and proper manner.  (See § 2034.300, subd. (a)(1).)

The trial court denied this motion on the condition that Gravori be immediately deposed.

It was an abuse of discretion to permit McDonald to go forward with this surprise witness, deposition or no.  The problem was the absence of a reasonable justification for McDonald's delay in bringing Gravori into the case.  Neither doctor nor patient reported an explanation for delaying until the eve of trial.  Trial *counsel* submitted his own declaration, but this attorney declaration was worthless as a source of evidence:  the lawyer had no personal knowledge of the asserted facts, and this trial lawyer certainly was not offering to testify and be subjected

8

to cross-examination at trial.  Rather this "declaration" was just a legal brief:  advocacy on behalf of a client.  The absence of a reasonable justification meant allowing this tardy witness to testify was an abuse of discretion.

Of course, some late designations *can* have valid justifications.  Long-designated experts may suddenly become unavailable:  death, illness, incapacitation, and other serious and uncontrollable events can create an understandable need for replacements.  The world's supply of unexpected and unfortunate events is varied and unlimited.

McDonald, however, offered no reasonable justification.  There was no emergency or serious unexpected development.  There was only McDonald's pretrial consultation with his lawyer.

McDonald claims that, if there was an abuse of discretion, it was harmless.  This claim is untenable.  Absent Gravori's testimony, it is reasonably probable the jury would have reached a result more favorable to Zargaryan.  (See *Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 258.)  In other words, Gravori's testimony likely prompted the jury to award more to McDonald than it would have otherwise.

Gravori was an effective witness for McDonald, just as McDonald intended him to be.  Gravori recommended two surgical options for McDonald.  One involved removing herniated discs from the front of the spine and replacing them with a prosthetic disc or bone.  The other was to cut in from the back and to remove part of the joint next to the spinal cord.  Gravori said the first surgery would cost between $240,000 and $280,000, and the second between $140,000 and $200,000—but that it was possible McDonald might require *both* surgeries.  The risks of these surgeries included infection, stroke, coma, and death.

Another risk was the surgeries would be ineffective or would make the situation worse.

The jury awarded McDonald future medical expenses of $1,872,900. The award for past pain and suffering was $2 million and for future pain and suffering was $10 million. It is probable that Gravori's recommendation of expensive, risky, and intrusive spinal surgeries inflated some or all of these sums.

## DISPOSITION

We vacate the judgment and the costs order, remand for a new trial, and award costs to the appellants.

WILEY, J.

We concur:

STRATTON, P. J.

UZCATEGUI, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.